# STORE LEASE

THIS INDENTURE, made as of April 6, 2006, Witnesseth:

**E.A.V. Properties, Inc., an Illinois corporation** ................................................ **Lessor**,
hereby leases unto

**R. J. Reynolds Smoke Shop, Inc., a Delaware corporation, of itself and doing business as Marshall McGearty Tobacco Artisans** ................................................ **Lessee**,
and Lessee hereby accepts, the Premises known as the ground floor store premises having the address 3155 North Broadway Avenue, Chicago, Illinois 60657, as shown on Exhibit A attached hereto and made a part hereof (the "Premises") (the building at 3155-63 North Broadway Avenue, Chicago, Illinois, of which the Premises are a part, being hereinafter referred to as the "Building"), for the term of five (5) years, commencing June 1, 2006, and ending May 31, 2011, unless commencing later or sooner terminated as provided herein, to be occupied and used by Lessee solely for the purpose of operating a retail store utilized primarily for the sale of tobacco products and accessories and in which the sale of other products is merely incidental and where no one under 18 years old is permitted. Such "other products" shall consist of a limited selection of food and beverages, including, among other things, cheese plates, alcoholic drinks, and espresso drinks. The sale and consumption of alcoholic drinks at the Premises shall be permitted only as are pursuant to the terms and provisions of the Chicago Zoning Ordinance. To the extent permitted by law, smoking shall be permitted in the Premises, provided that neither smoke nor odors from the Premises shall infiltrate into any areas outside of the Premises. Except as expressly provided in Section 22(e) hereof, Tenant shall not be relieved of any of its obligations under this lease, whether in respect of rents due hereunder or otherwise, in the event applicable federal, state, or local law at any point prohibits or further restricts the aforesaid use of the Premises in any respect.

In Consideration Thereof, the Parties Covenant and Agree:

1. **RENT:** [dense fine print — largely illegible]

2. **SERVICES AND UTILITIES:** [dense fine print — largely illegible]

3. **LESSOR'S TITLE:** [dense fine print — largely illegible]

4. **RESERVED RIGHTS:** [dense fine print — largely illegible]

5. **DEFAULT UNDER EITHER LEASE:** [dense fine print — largely illegible]

6. **WAIVER OF CLAIMS:** [dense fine print — largely illegible]

7. **HOLDING OVER:** [dense fine print — largely illegible]

8. **SUBLETTING, ASSIGNMENT, OR TRANSFER OF CONTROL:** [dense fine print — largely illegible]

9. **CONDITION OF THE PREMISES:** [dense fine print — largely illegible]

EXHIBIT

1

Lessor to Lessee, unless the same is contained herein or made a part hereof. At the termination of this lease by lapse of time or otherwise, Lessee shall return the Premises and all equipment and fixtures therein in as good condition as when Lessee took possession, and all subsequent work thereon was completed, ordinary wear and tear excepted, failing which Lessor may restore the Premises, equipment and fixtures to such condition and Lessee shall pay the cost thereof upon request. (See Section 13 hereof.)

10. ALTERATIONS: Lessee shall not make any alterations in or additions to the Premises without Lessor's advance written consent in each and every instance. Lessor's decision to refuse such consent shall be conclusive, but shall not be unreasonably withheld or delayed. If Lessor consents to such alterations or additions, then, before commencement of the work or delivery of any materials onto the Premises or into the Building, Lessee shall furnish Lessor with plans and specifications, names and addresses of contractors, copies of contracts, necessary permits and indemnifications, in form and amount satisfactory to Lessee, against any and all claims, costs, damages, liabilities and expenses which may arise in connection with the alterations or additions.

11. USE OF PREMISES:

12. REPAIRS AND MAINTENANCE:

13. UNTENANTABILITY:

14. EMINENT DOMAIN:

15. REMEDIES:

(c) Lessee shall pay upon demand all of Lessor's costs, charges and expenses, including the reasonable fees of counsel, agents and others retained by Lessor, incurred in enforcing Lessee's obligations hereunder or incurred by Lessor in any litigation, negotiation or transaction in which Lessee causes Lessor, without Lessor's fault, to become involved or concerned.

(f) No event any lien upon Lessor's title results from any act or neglect of Lessee, and Lessee fails to remove said lien within ten days after Lessor's notice to do so, Lessor may remove the lien by paying the full amount thereof or otherwise and without any investigation or contest of the validity thereof, and Lessee shall pay Lessor as additional rent, upon request, the amount paid out by Lessor in such behalf, including Lessor's costs, expenses and counsel fees, and interest thereon.

16. NOTICES: In every instance where it shall be necessary or desirable for Lessor to serve any notice or demand upon Lessee, it shall be sufficient, to the extent permitted by law, (a) to deliver or cause to be delivered to Lessee a written or printed copy thereof, or (b) to send a written or printed copy thereof by United States certified or registered mail, postage prepaid, addressed to Lessee at the Premises, in which event the notice or demand shall be deemed to have been served at the time the copy is mailed, or (c) to leave a written or printed copy thereof with some person above the age of thirteen years in possession of the Premises or to affix the same upon any door leading into the Premises, in which event the notice or demand shall be deemed to have been served at the time the copy is so left or affixed. All such notices shall be signed by or on behalf of Lessor. (See Section 30 hereof.)

17. MISCELLANEOUS:

(a) No receipt of money by Lessor from Lessee after the termination of this lease or of Lessee's right to possession of the Premises, after the service of any notice, after the commencement of any suit, or after final judgment for possession of the Premises, shall renew, reinstate, continue or extend the term of this lease or affect any such notice, demand or suit.

(b) No waiver of any default of Lessee hereunder shall be implied from any omission by Lessor to take any action on account of such default if such default persists or be repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated. The invalidity or unenforceability of any provision hereof shall not affect or impair any other provision.

(c) In the absence of fraud, no person, firm or corporation, or the heirs, legal representatives, successors and assigns, respectively, thereof, executing this lease as agent, trustee or in any other representative capacity, shall ever be deemed or held individually liable hereunder for any reason or cause whatsoever.

(d) The words "Lessor" and "Lessee" wherever used in this lease shall be construed to mean Lessor or Lessee in all cases where there is more than one Lessor or Lessee, and necessary grammatical changes required to make the provisions hereof apply either corporations (or other legal entities) or individuals, or to men or women, shall in all cases assumed or though in each case fully expressed.

(e) Provisions inserted herein or affixed hereto shall not be valid unless appearing in a duplicate original hereof held by Lessor. In event of variation or discrepancy, Lessor's duplicate shall control.

(f) Each provision hereof shall extend to and shall, as the case may require, bind and inure to the benefit of Lessor and Lessee and their respective heirs, legal representatives, successors, and shall bind and inure to the benefit of Lessor and Lessee and their respective assigns in the event this lease has been assigned by Lessor or in the event this lease has been assigned by Lessee with the express written consent of Lessor.

(g) Submission of this instrument for examination does not constitute a reservation of option for the Premises. This instrument becomes effective as a lease only upon execution and delivery both by Lessor and Lessee.

(h) The headings of sections of this lease are for convenience only, and do not define, limit or construe the contents of the sections.

(i) All amounts (other than Rent) owed by Lessee to Lessor hereunder shall be paid within ten days from the date Lessor renders statements of account therefor and shall bear interest at the rate of fifteen percent (15%) per annum thereafter until paid.

(j) Provisions typed on this lease and signed by Lessor and Lessee, and all riders attached to this lease and signed by Lessor and Lessee, are hereby made a part of this lease as though inserted at length in this part of this lease.

(k) If Lessee shall occupy or otherwise have possession of the Premises prior to the beginning of the term of this lease with Lessor's consent, all the provisions of this lease shall be in full force and effect as soon as Lessee occupies or otherwise has possession of the Premises. Rent for any period prior to the beginning of the term of this lease shall be fixed by agreement between Lessor and Lessee.

18. RIDER: The Rider attached hereto and made a part hereof is incorporated herein by reference and contains Sections 19 through 32 hereof, inclusive. In the event of any conflict between the provisions of Sections 1 through 18 of this lease and the provisions set forth in Sections 19 through 32 of this lease, the provisions of Sections 19 through 32 shall control.

In Witness Whereof, the parties hereto have caused this indenture to be executed under their seals, as of the date first above written.

LESSOR:

F.A.Y. PROPERTIES, INC.

By _____
Nathaniel X Grey
President

LESSEE:

R. J. REYNOLDS SMOKE SHOP, INC.

By _____
E. Scott Rhodes, Jr.
Vice President

3

RIDER ATTACHED TO AND MADE PART OF THE STORE LEASE,
DATED AS OF APRIL 6, 2006, BY AND BETWEEN
F.A.Y. PROPERTIES, INC., LESSOR,
AND R. J. REYNOLDS SMOKE SHOP, INC., OF ITSELF
AND DOING BUSINESS AS MARSHALL MCGEARTY TOBACCO ARTISANS, LESSEE,
FOR THE GROUND FLOOR STORE PREMISES AT
3155 NORTH BROADWAY AVENUE, CHICAGO, ILLINOIS 60657

19.  Base Rent.

(a)  The base rental ("Base Rent") payable by Lessee to Lessor pursuant to Section 1 hereof for each Lease Year (as defined in Section 19(b) hereof) shall be as follows:

| Lease Year | Period | Total Base Rent for Period | Equal Monthly Installment of Base Rent |
|---|---|---|---|
| .1 | 06/01/06-08/31/06 | $0.00. | $0.00 |
| 1 | 09/01/06-05/31/07 | $ 81,000.00* | $ 9,000.00* |
| 2 | 06/01/07-05/31/08 | $111,240.00 | $ 9,270.00 |
| 3 | 06/01/08-05/31/09 | $114,600.00 | $ 9,550.00 |
| 4 | 06/01/09-05/31/10 | $118,020.00 | $ 9,835.00 |
| 5 | 06/01/10-05/31/11 | $121,560.00 | $10,130.00 |

*  See Section 19(b) hereof.

(b)  The Base Rent for each Lease Year shall be payable in equal monthly installments, as indicated in Section 19(a) hereof (and, if applicable, Section 22(c) hereof), in advance, promptly on the first (1st) day of each calendar month of such Lease year during the term hereof; provided, however, that (i) contemporaneous with Lessee's execution and delivery of this lease, Lessee shall have paid to Lessor the $9,000.00 of Base Rent for the month of September 2006, but (ii) in the event that, due to a holdover by the current tenant at the Premises, Lessor is unable to tender possession of the Premises to Lessee on or before June 1, 2006, (A) the Base Rent for the period from and after September 1, 2006, shall be abated on a pro rata basis and shall not be payable for any period prior to ninety (90) days after the date Lessor tenders possession of the Premises to Lessee (the "Delayed Rent Commencement Date"), (B) such pre-payment of Base Rent shall instead be for the first full calendar month from and after the Delayed Rent Commencement Date, or shall be promptly refunded to Lessee in the event Lessee properly terminates this lease pursuant to Section 21(a) hereof, and (C) if the Delayed Rent Commencement Date is on a day other than the first day of a calendar month, Lessee shall pay in advance the Base Rent for the balance of such calendar month on or before the Delayed Rent Commencement Date, in an amount equal to the sum of $300.00 per day for each day from and including the Delayed Rent Commencement Date and the last day of such calendar month.  A "Lease Year" hereunder is a consecutive 12-month period commencing on June 1 of each calendar year during the term hereof and ending on May 31 of the following calendar year, except that, if the term of this lease commences after June 1, 2006, the first Lease Year shall commence on the day that Lessor tenders possession of the Premises to Lessee and shall end on May 31, 2007.

20.  Real Estate Tax Rent and Insurance Rent.

(a)  (i)  In addition to the payments of Base Rent required of Lessee hereunder, Lessee, in accordance with the provisions of this Section 20 set forth below, shall be responsible for and shall pay to Lessor as additional rent hereunder ("Real Estate Tax Rent") Lessee's proportionate share of any increases in the cost of real estate taxes ("Real Estate Taxes") incurred by or for Lessor or Lessor's

affiliate(s) in respect of the improvements and land at 3155-63 North Broadway Avenue, Chicago, Illinois (the "Property"). The regular real estate taxes for the Property have heretofore been billed by and payable to the Cook County Collector under Permanent Index Number 14-28-102-007).

      (ii)  Commencing on or about October 1, 2007 for the first Lease Year, and then, for each subsequent Lease Year, on or about October 1 of each calendar year thereafter through the calendar year in which the term hereof expires, or as soon as practicable after each such October 1 date, Lessor will calculate and, if owing, bill Lessee Real Estate Tax Rent for the applicable Lease Year in the sum of twenty-five percent (25%) of the amount, if any, by which (A) the Real Estate Taxes payable for the real estate tax assessment year in which such Lease Year begins exceed (B) the Base Year Real Estate Taxes. Lessee shall pay the Real Estate Tax Rent within ten (10) days after being billed therefor in each such instance. The "Base Year Real Estate Taxes" are the Real Estate Taxes that will be assessed and billed by the Cook County Collector for the 2005 real estate tax assessment year, but which are expected to be payable during calendar year 2006. Lessor shall furnish to Lessee, once available and upon Lessee's request, copies of the bills for Real Estate Taxes to be issued by the Cook County Collector for the Base Year Real Estate Taxes and any subsequent real estate tax assessment years for which Real Estate Tax Rent shall then be payable under this Section 20.

      (b)  (i)  In addition to the payments of Base Rent and Real Estate Tax Rent required of Lessee hereunder, Lessee, in accordance with the provisions of this Section 20 set forth below, shall be responsible for and shall pay to Lessor as additional rent hereunder ("Insurance Rent") Lessee's proportionate share of any increases in the costs incurred by or for Lessor or Lessor's affiliate(s) for the following insurance (or the substantial equivalent thereof or the commercially acceptable substitute therefor), which shall be maintained by or for Lessor or Lessor's affiliate(s) during the term hereof in respect of the Property (the "Building Insurance"):

(A)  Property insurance, sometimes referred to as "direct physical loss or damage" property insurance (including, without limitation, fire and extended insurance coverage, with vandalism and malicious mischief endorsements), covering up to the full replacement cost value of the Building and Lessor's loss of rents or business income from the Building; and

(B)  Public liability insurance (including commercial general liability or similar liability insurance and any excess or umbrella liability insurance) for the Building, protecting Lessor's interests.

      (ii)  Commencing in or after December 2006 for the first Lease Year, and then annually thereafter for each subsequent Lease Year, Lessor will calculate and, if owing, bill Lessee Insurance Rent for the applicable Lease Year in the sum of twenty-five percent (25%) of the amount, if any, by which (i) the total amount of the Building Insurance premiums incurred by Lessor for the calendar year in which such Lease Year begins exceeds (ii) the total amount of the Building Insurance premiums incurred by Lessor for calendar year 2005 (the "Base Year Insurance Premiums"), as provided in a supporting statement ("Supporting Statement") from Lessor's insurance agent, insurance counsel, insurance consultant, or accountant that is similar in form to the April 26, 2006 Letter from Lessor's accountant indicating that the Building Insurance premiums were $5,668.00 for 2005, as calculated by such accountant, a copy of which letter is attached hereto as Exhibit B and made a part hereof. Lessee shall pay the Insurance Rent within ten (10) days after Lessor bills Lessee therefor in each such instance. Lessor shall furnish a Supporting Statement to Lessee with each such bill, and shall furnish a Supporting Statement to Lessee for the Base Year Insurance Premiums with the first such bill, if Lessor has not done so before then.

      (c)  At Lessor's election made in writing to Lessee at any time, Lessor may thereafter require Lessee to pay Real Estate Tax Rent and/or Insurance Rent for any Lease Year, in advance, promptly on the first day of each calendar month during such Lease Year, whether or not Lessor renders a monthly statement of account therefor, in an amount equal to one-twelfth (1/12) of Lessor's best reasonable estimate(s) of

the Real Estate Tax Rent and/or Insurance Rent for such Lease Year, subject, however, to any "catch-up" or "credit back" adjustments under this Section 20(c) below. For each Lease Year (even if such Lease Year has already ended), after Lessor receives the bill for the second installment of Real Estate Taxes payable to the Cook County Collector for the real estate tax assessment year in which such Lease Year begins and/or receives a Supporting Statement for the calendar year in which such Lease Year begins, the total of such estimated monthly installments of Real Estate Tax Rent and/or Insurance Rent theretofore collected by Lessor for such Lease Year (and, if applicable, for the next Lease Year thereafter), shall be adjusted higher or lower, as the case may be, to reflect the full amount of the actual Real Estate Taxes payable for the real estate tax assessment year in which such Lease Year begins and/or the actual total amount of the Building Insurance premiums incurred by Lessor for the calendar year in which such Lease Year begins. Each such adjustment shall be made by Lessee's paying to Lessor (i.e., to "catch-up") any accumulated deficiency of Real Estate Tax Rent and/or Insurance Rent within ten (10) days after being billed therefor by Lessor, or, as the case may be, by Lessee's receiving a credit against the Real Estate Tax Rent and/or Insurance Rent payment(s) next due for any accumulated overpayment (i.e., to "credit back" Lessee).

(d)    Notwithstanding the foregoing provisions of this Section 20 providing for Lessee's share of increases in Building Insurance premiums to be 25%, Lessee shall pay Lessor Insurance Rent, in accordance with the provisions above, for one hundred percent (100%) of any increases in the Building Insurance premiums as shall be reasonably determined to be directly attributable to Lessee's use of the Premises for the sale and consumption of tobacco and alcoholic products and for smoking at the Premises, as confirmed by Lessor's insurer, insurance agent, or insurance consultant.

21.    Possession of the Premises.

(a)    In the event that, due to a holdover by the current tenant at the Premises, Lessor is unable to tender possession of the Premises to Lessee on or before June 1, 2006, the term of this lease shall not commence until Lessor actually tenders possession of the Premises to Lessee, which Lessor shall do as soon as reasonably practicable after Lessor shall have obtained possession of the Premises from such current tenant. If Lessor fails to tender possession of the Premises to Lessee on or before September 15, 2006, Lessee thereafter may terminate this lease by giving Lessor notice of such termination before Lessor tenders possession of the Premises to Lessee, whereupon Lessor shall promptly refund the Base Rent for the first full month of the term hereof that Lessee shall have pre-paid to Lessor. For purposes of this lease, Lessor shall be deemed to have tendered possession of the Premises to Lessee upon delivering to a representative of Lessee (which may be Lessee's broker) a key or keys to the Premises or, if earlier, upon giving Lessee or a representative of Lessee written notice that Lessor is prepared to give possession of the Premises to Lessee; provided, however, that in any event, Lessor need not give Lessee physical possession of the Premises unless and until Lessee shall have furnished to Lessor evidence reasonably satisfactory to Lessor of Lessee's compliance with all of Lessee's insurance requirements hereunder.

(b)    From and after the time Lessor gives physical possession of the Premises to Lessee, but subject to the other provisions of this lease and provided that Lessee is not in default hereunder, Lessee shall be entitled during the term hereof to have peaceful possession of the Premises and to quietly have and enjoy the Premises without any disturbance from Lessor or any other person claiming through Lessor. Subject to the provisions of Sections 19(b) and 21(a) hereof and the other provisions of this lease, Lessee shall be fully liable for payment and performance of Lessee's covenants hereunder from and after the date of full execution and delivery of this lease.

22.    Term of Lease.

(a)    Subject to Section 21(a) hereof, the term of this lease runs for five (5) years, from June 1, 2006 through May 31, 2011 (unless earlier terminated as herein provided). Except as expressly provided herein, (i) under no circumstances does the term of this lease run beyond May 31, 2011, and (ii) no representations have been made that Lessee's tenancy at the Premises will be extended beyond that date.

(b)    (i) Provided this lease is in full force and effect and Lessee is not in default hereunder either as of the date the First Renewal Option is exercised or upon expiration of the initial term of this lease on May 31, 2011, Lessee shall have the option (the "First Renewal Option") to extend the term hereof for a renewal term of five (5) years (the "First Renewal Term") by giving Lessor written notice (the "Renewal Notice" for the First Renewal Option) of Lessee's election to do so not less than six (6) months, nor more than nine (9) months, prior to expiration of the initial term hereof.

(ii) Provided this lease is in full force and effect and Lessee is not in default hereunder either as of the date the Second Renewal Option is exercised or upon expiration of the First Renewal Term, if any, on May 31, 2016, Lessee shall have the option (the "Second Renewal Option") (each of the First Renewal Option and the Second Renewal Option being a "Renewal Option") to extend the term hereof for an additional renewal term of five (5) years (the "Second Renewal Term") (each of the First Renewal Term and the Second Renewal Term being a "Renewal Term") by giving Lessor written notice (the "Renewal Notice" for the Second Renewal Option) of Lessee's election to do so not less than six (6) months, nor more than nine (9) months, prior to expiration of the First Renewal Term, if any.

(c)    (i) The Base Rent payable by Lessee to Lessor pursuant to Section 1 hereof for each Lease Year of a Renewal Term shall be payable in equal monthly installments, rounded to the nearest dollar.  The Base Rent for the first Lease Year of each Renewal Term (the "Renewal Year Base Rent") shall be equal to the greater of (A) three percent (3%) more than the Base Rent for the immediately preceding Lease Year (the "Minimum Renewal Year Base Rent"), and (B) the market Base Rent for the Premises at the commencement of the Renewal Term, as determined in accordance with the provisions of this Section 22(c) below (the "Market Renewal Year Base Rent").  The Base Rent for each of the second through fifth Lease Years of a Renewal Term shall be three percent (3%) greater than the Base Rent for the immediately preceding Lease Year.

(ii) If Lessee timely and properly exercises the First Renewal Option and, if applicable, the Second Renewal Option, then, not less than five (5) months prior to expiration of the initial term hereof and, if applicable, the First Renewal Term, Lessor shall send to Lessee a return notice indicating either (A) Lessor's statement that the Market Renewal Year Base Rent is not greater than the Minimum Renewal Year Base Rent, in which case the Minimum Renewal Year Base Rent will be the Renewal Year Base Rent, or (B) Lessor's statement of the amount of the Market Sixth Year Base Rent, if higher than the Minimum Renewal Year Base Rent.  In the latter case, if Lessee objects to Lessor's said statement of the Market Renewal Year Base Rent as set forth in said return notice from Lessor, Lessee shall give Lessor a further notice objecting to Lessor's said statement of the Market Renewal Year Base Rent within fourteen (14) days after Lessor has given Lessee said return notice, failing which the Renewal Year Base Rent shall be the amount of the Market Renewal Year Base Rent as set forth in Lessor's said return notice.

(iii) If Lessee, in such a timely further notice to Lessor, does so object to Lessor's said statement of the amount of the Market Renewal Year Base Rent, and if Lessor and Lessee are unable to agree upon the Market Renewal Year Base Rent within three (3) months prior to expiration of the then current term hereof, the Market Renewal Year Base Rent shall be determined by arbitration, which shall be promptly conducted before three arbitrators (unless the parties agree to one arbitrator) designated by the American Arbitration Association in accordance with the rules of such Association.  The arbitrator(s) designated and acting under this Section 22(c) shall make their determination in strict conformity with such rules and the provisions of this lease, and shall have no power to depart from or change any of the provisions of such rules or of this lease.  The parties shall bear equally the expense of arbitration proceedings conducted under this Section 22(c), but in any event each party shall be solely responsible for the costs of its own attorneys and related costs for its own benefit.  All such proceedings shall be conducted in the county in which the Premises are located.  Except as expressly provided in this

Section 22(c), nothing contained herein calls for the arbitration of any dispute between the parties. Irrespective of the arbitrator's (or arbitrators') determination of the Market Renewal Year Base Rent, the Renewal Year Base Rent may not, in any event, be less than the Minimum Renewal Year Base Rent.

(iv)  If for any reason a Renewal Term commences before the Renewal Year Base Rent for such Renewal Term is determined, then from the date of commencement of such Renewal Term until such determination is made, Lessee shall pay the Minimum Renewal Term Base Rent for the first Lease Year of such Renewal Term, and, if applicable, the Base Rent shall increase each Lease Year thereafter by three percent (3%) per Lease Year over the Base Rent for the immediately preceding Lease Year. If the Base Rent for such Renewal Term is determined to be greater than the Base Rent so paid, Lessee shall, not less than ten (10) days following the issuance of such determination, pay to Lessor (A) the difference between the Base Rent so paid and the Base Rent which should have been paid on the basis of such determination, and (B) interest thereon at the rate of seven and one-half percent (7-1/2%) per annum from the dates such larger payments should have been made on the basis of such determination until the date such difference is actually paid, which interest shall be additional rental hereunder. Lessee shall pay the Base Rent for the remainder of such Renewal Term on the basis of such determination, subject to the yearly Base Rent increases required under Section 22(c)(i) hereof.

(d)  Notwithstanding anything to the contrary in this lease, Lessor shall have the right to terminate this lease (as it from time to time may be modified and/or extended hereunder or otherwise by agreement of the parties), effective as of any date from and after May 31, 2011, and without any compensation to Lessee, if Lessor sells the Building with or without the land under it, or if Lessor proposes or is required, for any reason, (i) to rehabilitate or demolish the entire Building or any substantial portion of it, (ii) to sell the Building, with or without the land under it, (iii) to make a long term ground lease for all or substantially all of the land underlying the Building, or (iv) to convey Lessor's interest in such a long term ground lease, in the event Lessor first makes such a long term ground lease without terminating this lease (as it may be modified and/or extended) under the preceding item (iii). Such termination shall become effective and conclusive by Lessor giving written notice thereof to Lessee not less than six (6) months prior to the effective termination date fixed in such notice. The right reserved to Lessor in this Section 22(d) shall inure to the benefit of Lessor's purchasers, successors, assignees, principals, lessees, transferees, and ground lessees, as the case may be, and is in addition to all other rights of Lessor.

(e)  Notwithstanding anything to the contrary in this lease, but provided this lease is in full force and effect and Lessee is not in default hereunder either as of the date Lessee gives Lessee's Termination Notice to Lessor or as of the effective date of the termination of this lease fixed therein, in the event applicable federal, state, and/or local law at any point prohibits or further restricts, in any material respect, Lessee's use of the Premises as a retail store utilized primarily for the sale of tobacco products and accessories and in which the sale of other products is merely incidental and where no one under 18 years old is permitted, Lessee shall have the right to terminate this lease for such reason, without compensation to Lessor, effective as of any date after the end of the second Lease Year of either the First Renewal Term or the Second Renewal Term, if any, by (i) giving Lessor written notice ("Lessee's Termination Notice") of such termination not less than ninety (90) days prior to the effective termination date fixed in such notice, which notice shall state the specific reason(s) for such termination, and (ii) submitting to Lessor therewith a lease termination fee in the amount of one-third (1/3) of the total Base Rent that would otherwise be payable by Lessee from the effective date of such termination through the theretofore scheduled last date of the term of this lease, as extended.

(f)  Except for the provisions of this Section 22, and subject to any amendments or modifications of this lease, the terms, provisions, covenants, and conditions of this lease for any Renewal Term shall be the same as are contained in this lease immediately prior

to commencement of such Renewal Term.  In the event of Lessee's exercise of both Renewal Options as aforesaid, under no circumstances shall the term of this lease run beyond May 31, 2021.  No representations have been made that Lessee's tenancy at the Premises will be extended beyond that date.

23.    Condition of Premises and Building Systems.  Lessee shall take possession of the Premises and the mechanical equipment and Building systems serving the Premises strictly on an "as is" basis.  Lessor makes no warranties or representations that any of the mechanical equipment or Building systems serving the Premises work or will work or be sufficient to handle any expected requirements of Lessee.  Lessor shall not be required to make any improvements to the Premises or the mechanical equipment and Building systems serving the Premises, and Lessor shall have no responsibility for same.  To the best of Lessor's knowledge, there are no outstanding building code violation notices in respect of the Building as of the date hereof.

24.    Alterations, Improvements, Remodeling, Repairs, Etc.

(a)    Lessee shall be required to do all work and incur all costs, and under no circumstances shall Lessor be required to do any such work or incur any such costs, as may be needed to prepare the Premises, the storefront for the Premises, and the mechanical equipment and Building systems serving the Premises for Lessee to occupy the Premises and open for business in a first-class store in the Premises for the purpose(s) for which the Premises may be used hereunder, in compliance with all laws and regulations applicable to Lessee and its use of the Premises, and in conformity with plans, drawings, and specifications for such work reasonably approved by Lessor and with the other requirements for such work set forth in this lease.  In connection therewith, (i) Lessee represents and warrants that Lessee has budgeted the sum of $450,000.00 to $550,000.00 for the cost of building out the Premises and has such sum available to it for such purpose, and (ii) Lessee shall install a new HVAC system for the Premises, and/or shall make appropriate modifications to the existing HVAC system for the Premises, that will prevent smoke and odors from infiltrating from the Premises to areas outside the Premises,

(b)    All remodeling, alterations, additions, improvements, repairs, and replacements made by Lessee in respect of the Premises shall be at Lessee's sole expense, shall be subject to Lessor's reasonable control, and shall conform to Lessee's plans, drawings, and specifications for such work which shall be subject to approval by Lessor, including with respect to the Building's structure, schemes, and designs.  In addition to obtaining the consent of Lessor required under Section 10 hereof, prior to commencing any alterations, additions, improvements, remodeling, non-routine repairs, and/or non-routine replacements at or for the Premises or on any other part of the Building at any time (other than Lessee's initial build-out of the Premises), Lessee shall, if requested by Lessor, furnish to Lessor evidence reasonably satisfactory to Lessor that Lessee has prepaid for, and/or has set aside sufficient funds to complete, the work so to be done at the Premises, free and clear of any liens or encumbrances whatsoever.  Lessee shall be responsible for obtaining, and for paying the cost of, any and all permits required for any such proposed work.  Lessee shall fully and promptly pay for all work done, or claimed to have been done, by or for Lessee at or for the Premises.  Lessee shall cause its contractor(s) to cooperate with, and be responsive to, Lessor's designated representative(s) for purposes of enabling Lessor to determine whether Lessee has complied with the provisions of Section 10 hereof and this Section 24 and whether Lessee has performed such work in strict compliance with the plans, drawings, and specifications for such work which, in any event, must be approved by Lessor before such work commences.  Lessor shall not unreasonably withhold or delay its approval of such plans, drawings, and specifications.

(c)    All work, improvements, and fixtures, whether furnished by Lessor or Lessee, in respect of the Premises shall become part of the Premises and shall be the property of Lessor at the termination of this lease, whether by lapse of time or otherwise; provided, however, that, as to any trade fixtures furnished by Lessee which Lessee may desire to detach and remove from the Premises prior to said termination, and as to any and all such items and/or other items furnished by Lessee which Lessor requests that Lessee remove from the Premises, Lessee, at its sole cost, shall detach and remove said items from the Premises and

shall return those portions of the Premises and/or the fixtures to which any of said items were previously attached in good and safe condition. For purposes of Section 10 hereof and this Section 24(c), "trade fixtures" are those pieces of attached furniture, equipment, counters, cabinetry, and shelving which are used in the process of, and for the specific purpose of, conducting Lessee's business at the Premises. Except as expressly provided above in this Section 24(c), Lessee may not remove from the Premises, among other things, any heating, ventilation, air-conditioning, or hot water heating equipment, or any bathroom, plumbing, window, light, or security fixtures.

25.   Housekeeping, Etc.

(a)    Lessee shall keep all garbage, refuse, and waste at or from the Premises in covered, airtight receptacles, and shall properly maintain said devices. If and so long as Lessor at any point provides one or more refuse removal containers and coordinates a refuse removal service for the tenants of the Building, Lessee shall properly utilize said container(s) and pay to Lessor Lessee's pro rata share of said service, as determined by Lessor, as additional rent hereunder. Until such time, if any, as Lessor at any time provides said container(s) and/or service, Lessee shall provide and pay for its own refuse removal container and for its own scavenger service, with removal at a minimum of six (6) times per week (but this is subject to change, to a greater or lesser frequency of pick-ups, at Lessor's request, if in Lessor's absolute judgment sanitation requirements so warrant), and said refuse removal container shall be placed in any exclusive or nonexclusive scavenger pick-up area as may be designated by Lessor from time to time.

(b)    Lessee shall employ as needed, at its own expense, an exterminator to keep the Premises free and clear of all rats, mice, insects, pests, and vermin of any nature, so as to prevent contamination of the Premises, the other parts of the Property, and surrounding properties.

(c) ·  There are available to and installed at or for the Premises valuable mechanical equipment and Building systems for heating, ventilation, air conditioning, water heating, plumbing, electric service, gas service, etc. Proper operation, and the prompt and competent maintenance, repair, and replacement, of all the mechanical equipment and Building systems on, in, or exclusively serving the Premises, whether furnished by Lessor or Lessee, are the sole responsibility of Lessee, and Lessee shall perform any and all such maintenance, repairs, and replacements at its sole cost and expense, and shall return to Lessor, at the termination of Lessee's tenancy at the Premises, all of said equipment and systems (as improved and maintained as herein provided), installed and in good order and satisfactory condition, less ordinary and reasonable wear and tear.

(d)    Lessee shall maintain, repair, and replace, as required to keep in good condition, the storefront for the Premises, the walls, doors, doorframes, locks, ceilings, floors, bathroom, sink(s), windows, and window frames of the Premises, and all other portions of the Premises and appurtenances thereunto. Upon termination of this lease, Lessee shall return the Premises to Lessor in good condition, as improved and maintained as herein provided, subject only to ordinary and reasonable wear and tear.

Without in any way limiting the provisions of Sections 6, 13, and 25(c) hereof or any other provisions hereof, but notwithstanding the foregoing provisions of Section 25© hereof or this Section 25(d), Lessee shall not be responsible for maintaining, repairing, or replacing the electrical, plumbing, and HVAC equipment and systems in the Building that is neither on or in the Premises or exclusively serving the Premises, nor the foundation, floor joists, roof, and exterior walls of the Building; provided, however, that Lessee shall be so responsible for (i) the storefront and any exterior signage, awning, and/or banner for Lessee and/or the Premises, (ii) all flashings and any other roof, exterior wall, or structural work as may be needed in respect of any and all roof, exterior wall, floor and/or ceiling penetrations made by or for Lessee or otherwise for the benefit of the Premises and/or in respect of all rooftop equipment and/or any other equipment or systems exclusively serving Lessee or the Premises, and (iii) any maintenance, repair, or replacement in, on, or about the Building that is needed at any time due to (A) Lessee's build-out or

specific use of the Premises, or (B) the fault of Lessee, its servicemen, contractors, employees, customers, prospective customers, or anyone else through Lessee, or anyone protesting or demonstrating for or against smoking, tobacco, Lessee, Lessee's affiliates, and/or Lessee's use of the Premises.

(e)    Lessee agrees to install and maintain grease traps for the sinks, drains, and other plumbing in and for the Premises so as to catch and eliminate grease or hard waste, and prevent grease and hard waste from entering the drain or sewer lines in or for the Premises, branch lines, and/or the main line to the street.  Should Lessor or Lessee find any kind of debris from or attributable to Lessee in the drain lines in or for the Premises, branch lines, and/or the main line to the street, as the case may be, Lessee shall be fully liable therefor and shall pay the costs for rodding such drain lines.  Lessor may, but need not, arrange for such rodding to be done in a manner not through Lessee, and all costs incurred by Lessor in connection therewith shall be reimbursed to Lessor by Lessee and shall be considered additional rent hereunder.

(f)    Lessee, at its sole cost, shall furnish, install, and maintain in good operating condition, with proper placement at all times, and in compliance with all applicable code requirements for the Premises, an appropriate number of smoke detectors, fire extinguishers, and carbon monoxide detectors suitable for the Premises.

(g)    Lessor shall not permit any customers, prospective customers, and/or other persons, while outside and of and nearby the Premises, to smoke or drink alcoholic beverages (except passing sidewalk pedestrians in the ordinary course), to congregate, or to picket and/or protest for or against smoking, tobacco, Lessee, any affiliate of Lessee, and/or Lessee's use of the Premises.  Lessee shall, at its sole expense, use all reasonable legal means to prevent any such event or activity, whether before, upon, or as soon as practicable after the occurrence of any such event or activity.

(h)    Lessor shall be given routine access to the Premises during ordinary working hours for inspection purposes to ascertain that the requirements under Section 11 hereof and this Section 25 are being met.

26.    Insurance.

(a)    Lessee, at Lessee's expense, shall purchase and maintain insurance during the term hereof for the benefit of Lessor, General Auto Service Station, LLC (which is the sole beneficial owner of the property for which Lessor is acting as nominee/agent hereunder), Malet Realty, Ltd. (or any successor managing agent for the Property), any mortgagee(s) for the Property, and their respective agents, employees, nominees, successors, and assigns (as their respective interests may appear) (the "Insured Parties"), and for the benefit of Lessee, with terms and coverages, and in companies, that are satisfactory to Lessor. Lessee agrees to adjust the amounts and types of coverages set forth herein, as required by Lessor, if the customs or standards in the leasing community change during the term of this lease; but, initially, Lessee shall maintain at a minimum the following insurance coverages with the following limits:

(i) Commercial general liability insurance on an occurrence basis having (A) a minimum combined single limit of liability for each occurrence in the amount of not less than five million dollars ($5,000,000.00) for bodily injury, personal injury, death, and/or property damage (including, but not limited to, water damage), and (B) an annual aggregate limit of liability of not less than ten million dollars ($10,000,000.00) for same.  Said insurance coverage may be from a combination of Lessee's primary and excess umbrella coverages under one or more policies that shall cover Lessee's assumed contractual liabilities under this lease; and

(ii) Comprehensive automobile insurance covering all owned, nonowned, and hired automobiles of Lessee which (A) has a minimum combined single limit of liability for each accident of not less than five million dollars ($5,000,000.00) for bodily injury, death, and/or property damage, and (B) covers the loading and unloading of any automobile.  Said insurance coverage may be from a combination of Lessee's primary and excess umbrella coverages under one or more policies; and

(iii) Coverage against all losses from fire, vandalism, and malicious mischief and extended coverage), in an amount adequate to cover Lessee for business interruption and to cover both Lessor and Lessee (to the extent of their respective interests therein) for the full replacement cost value of the leasehold improvements, plate glass, and business personal property in and for the Premises (including, without limitation, inventory, machinery, equipment, movable partitions, furniture, trade fixtures, and wall and floor coverings) and in an amount that meets any coinsurance clause requirements of the policy or policies of insurance; and

(iv) Full and comprehensive liquor liability and dram shop insurance on an occurrence basis. Lessee's right hereunder to store, sell, dispense, use, serve, permit consumption of, or give away alcoholic liquor or beverages or other intoxicating liquor products in, on, or from the Premises, as expressly provided elsewhere herein, is conditioned upon Lessee first furnishing the insurance policy as herein provided, and is further subject to and conditioned upon the following conditions:

(A) Lessee covenants and agrees to, and does hereby, indamnify, defend, and save and keep harmless the Insured Parties, during the continuance of this lease, from and against any and all suits, demands, claims, damages, payments, fines, liens, penalties, judgments, costs, and expenses whatsoever which may result to any or all of the Insured Parties, or to the Premises, the Building, the Property, or any part thereof, under or by force of the provisions of any present or future statute, ordinance, regulation, or other law, rule, or governmental measure of the United States of America, the State of Illinois, Cook County, Illinois, or the City of Chicago, Illinois, or any agencies or instrumentalities thereof, concerning the manufacture, storage, sale, use, serving, distribution, permitting consumption, or giving away of alcoholic liquor or other intoxicating liquor products in, on, or from the Premises, or otherwise in connection with this lease.

(B) Lessee must procure and maintain throughout the term of Lessee's occupancy of the Premises one or more policies of insurance in form reasonably satisfactory to Lessor, with the broadest coverage reasonably obtainable, indemnifying, defending, and saving and keeping harmless the Insured Parties from and against any and all claims, suits, payments, demands, damages, judgments, fines, penalties, liens, costs, and expenses whatsoever for which claim ever shall be made against any or all of the Insured Parties, or against the Premises, the Building, the Property, or any part thereof, by any person(s) who shall have been injured in any way in consequence of the intoxication, habitual or otherwise, of any person(s) resulting directly or indirectly from the manufacture, storage, sale, distribution, serving, use, permitting consumption, or giving away of alcoholic liquor or other intoxicating liquor products in, on, or from the Premises, or otherwise in connection with this lease, and for which injury or injuries any or all of the Insured Parties may be liable, or may be claimed to be liable, under or by virtue of the Illinois Liquor Control Act of 1934, as amended, or of any other federal, state, or local statute, ordinance, regulation, or other law, rule, or governmental measure. The amount of coverage for such insurance, for which Lessee shall pay the full premium cost, shall be a combined single limit of liability for each occurrence in the maximum amount available at a commercially reasonable cost, but in no event less than two million dollars ($2,000,000.00), for bodily injury, personal injury, death, and/or property damage (including, but not limited to, water damage). Such combined single limit sum shall be (1) increased as additional coverage is available, to the maximum extent available at a commercially reasonable cost, including additional coverage through an excess/umbrella liability policy, and (2) exclusive of all interest accruing on any judgment, which interest shall be paid by the carrier(s).

The existence of such policy or policies shall not limit or affect Lessee's undertakings set forth in Section 26(a)(iv)(A) above. The coverage therein shall be on an occurrence basis, for occurrences arising during the term of this lease and of Lessee's occupancy of the Premises, and shall remain in effect for any such claims made thereafter.

(C)     The manufacture, storage, sale, distribution, use, serving, or giving away of any alcoholic liquor or other intoxicating liquor products in, on, or from the Premises, or otherwise in connection with this lease, at any time or times during the term of Lessee's occupancy of the Premises when said policy (or policies) is not (or are not) in full force and effect, shall constitute a breach of this lease entitling Lessor forthwith, to the extent permitted by law, to terminate such term or this lease by entry or by notice, as Lessor may elect, and to recover from Lessee any damages, including, without limitation, all sums of money for which any or all of the Insured Parties may become liable to pay to any person(s) as a result of any violation of the Illinois Liquor Control Act of 1934, as amended, or any other statute, ordinance, regulation, or other law, rule, or governmental measure concerning same, together with the costs and expenses of any or all of the Insured Parties.

(D)     The terms "manufacture," "sale," "sell," and "alcoholic liquor," as used in this Section 26(a)(iv) and/or in Section 11(b) hereof, have the same meanings as are defined in Article 1 of the Illinois Liquor Control Act of 1934, as amended.

(b)     The Insured Parties shall be additional insureds under each policy referred to in Sections 26(a)(i) and (iv) hereof (including, without limitation, any excess and/or umbrella liability coverage policies applicable to each such policy), to the full extent of the policy limits thereunder, but such additional insured coverage may be limited to coverage with respect to claims arising out of Lessee's use and/or occupancy of the Premises and/or any other part of the Building and surrounding areas. The policy referred to in Section 26(a)(iv) hereof also shall specifically list General Auto Service Station, LLC and/or its respective successors and assigns as the owner of the Premises/Building. No policy referred to in Section 26(a) hereof shall be subject to any deductible amount unless such a deductible is customary for Lessee's use of the Premises, but in no event shall any policy referred to in Section 26(a) hereof provide for any deductible amount over $5,000.00 per occurrence. Each policy referred to in Section 26(a) hereof (i) shall provide for the insurer to pay for unlimited reasonable defense costs separate from any limits of liability as shall be incurred prior to any such time as the applicable limit(s) of liability shall be exhausted by the insurer's payment of any judgment(s) or settlement(s), and (ii) shall provide by its terms that such insurance may not be canceled (or amended in a manner adverse to Lessor's interests) without at least thirty (30) days prior written notice to Lessor. Lessee shall deliver to Lessor copies of all the insurance policies that Lessee is required to maintain hereunder, including all renewals and replacements thereof (or, if acceptable to Lessor, original certificates of insurance and copies of declarations pages and applicable endorsements for all such policies), prior to taking possession of the Premises and not less than ten (10) days prior to the expiration date or any other date of cancellation of such policies.

(c)     Each policy referred to in Section 26(a) hereof (i) shall provide coverage thereunder on a primary and non-contributory basis, (ii) shall provide that such insurance coverage thereunder shall not be invalidated should the insured thereunder waive in writing, prior to an occurrence giving rise to an insured claim thereunder, any or all right of recovery the insured would otherwise have had against any of the Insured Parties in connection with such occurrence, and (iii) shall contain an express waiver of subrogation whereby the insurer waives any right of recovery it would otherwise have against any of the Insured Parties in connection with such occurrence. Lessee hereby waives any and all claims for recovery from the Insured Parties for any loss or damage to any insured property of Lessee at the Premises and with

respect to any liability Lessee (or another insured) may have that is covered under the policies referred to in Section 26(a) hereof.

(d)   All policies of insurance to be purchased and maintained by Lessee hereunder with respect to leasehold improvements and any property of Lessor shall provide by their respective terms that any losses or claims thereunder shall be adjusted solely by, and the proceeds thereof shall be payable solely to, Lessor (or Lessor's designee), to the extent of Lessor's (or Lessor's designee's) insurable interest therein, with no interest therein being included as to Lessee.

(e)   Lessee agrees to, and does hereby, indemnify, defend, keep harmless, and insure, the Insured Parties, jointly and severally, to the extent permitted by law, against any and all claims, suits, fines, judgments, costs, reasonable attorneys' fees, liens, and other matters arising out of or in connection with this lease and/or the use or occupancy of the Premises or any other part of the Property and surrounding areas by Lessee or anyone through Lessee (including, without limitation, any and all claims, suits, fines, judgments, costs, reasonable attorneys' fees, liens, and other matters at any time arising out of or in connection with any smoking, tobacco sales, and/or alcoholic beverage sales or consumption at the Premises during the term hereof and/or any picketing or protests pertaining thereto).

27.   <u>Failure to Comply with Requirements; Additional Rent.</u>  In the event of any breach by Lessee of the provisions hereof with respect to alterations, additions, improvements, repairs, replacements, services, utilities, maintenance, housekeeping, compliance with laws, and/or insurance requirements, Lessor, as an additional remedy, may, but need not, make such payments and take such other actions as may be necessary to remedy same.  In any of these events, Lessee shall reimburse Lessor's costs in connection therewith promptly (but in no event later than ten (10) days after being billed therefor) as additional rent hereunder.

28.   <u>Non-Rental Defaults.</u>  In the event of a default hereunder by Lessee (other than a default that involves a hazardous condition or a failure by Lessee to pay any Base Rent, Real Estate Tax Rent, Insurance Rent, or other additional rents or other amounts due to Lessor hereunder), which default by its nature cannot reasonably be cured within the twenty (20) day period provided for in Section 15(b) hereof, then, provided that Lessee promptly commences to cure the condition complained of and promptly notifies Lessor thereof in writing during said twenty (20) day period, said twenty (20) day period shall be extended one day for each day that Lessee thereafter continues to diligently pursue such cure to completion.

29.   <u>Potential Litigation.</u>  Lessee, at its own cost and expense, and within seventy-two (72) hours of receipt of notice or knowledge of same, whichever occurs first, shall notify Lessor of any claims, notices, incidents, altercations, damages, and injuries to or in respect of the Property, the Premises, Lessee, or Lessor, which might foreseeably result in litigation or administrative action against the Property, the Building, the Premises, Lessee (if Lessee's ability to comply with its obligations under this lease may be affected thereby), or Lessor, or any combination of them.  In Lessee's notification to Lessor, Lessee shall furnish Lessor with copies of any and all documents that may have been presented to, are in the possession of, or were served upon, Lessee in connection therewith.

30.   <u>Notice.</u>  Any notice which either party hereto may desire or may be required to give to the other party shall be in writing; and (as alternative methods of providing notice by Lessor to Lessee in addition to the methods set forth in Section 16 hereof) the delivery of any such notice, or the mailing thereof by United States certified mail, return receipt requested, to the following persons and addresses, or to such other person(s) or address(es) as either party hereto may designate by notice in writing to the other party, shall constitute service of notice hereunder:

If to Lessee, to:

R. J. Reynolds Smoke Shop, Inc.
401 North Main Street, 6th Floor
Winston-Salem, NC 27104
ATTN: E. Scott Rhodes, Jr.

If to Lessor, to:

F.A.Y. Properties, Inc.
P.O. Box 6615
Chicago, IL 60680
ATTN: Nathaniel I. Grey

   With a copy to:

   Grey, Grey & Baltz, P.C.
   11 South LaSalle Street, Suite 1320
   Chicago, IL 60603
   ATTN: Jordan A. Grey

Notice shall be deemed to be given five (5) business days after such mailing, or, if sent by local messenger service, Federal Express, or similar overnight delivery service (including, without limitation, U.S. Express Mail), the date of delivery, if delivered (or if not delivered, the date of original attempted delivery, if attempted on a business day during business hours).

31.   Brokers.  Lessee represents and warrants to Lessor that (i) the only broker Lessee has retained in any capacity in connection with this lease is Janika Brenner of Baum Realty Group, Inc. ("Lessee's Broker"), (ii) Lessee is not aware of any claims, or any basis for any claims, by any other person, business, or entity for a commission as a procuring cause or otherwise in connection with this lease or Lessee's becoming a tenant at the Premises, except for CB Richard Ellis, the broker retained by Lessor in connection herewith ("Lessor's Broker"), and (iii) Lessee's Broker has agreed to share equally with Lessor's Broker the $24,589.00 total commission that Lessor anticipates paying to and/or at the direction of Lessor's Broker in connection with this lease, in installments pursuant to a written agreement between Lessor and Lessor's Broker.  Lessee acknowledges that (A) for each installment of such commission, Lessor would not be willing to pay directly to Lessee's Broker its share thereof without Lessor first receiving written direction to do so from Lessor's Broker, appropriate tax identification information for Lessee's Broker, and a separate accurate dated invoice from each broker for each such installment when it comes due, and (B) Lessor will not in any event be paying a broker's commission in connection with this lease in the event Lessee terminates this lease pursuant to the provisions of Section 22(e) hereof.  Lessee further acknowledges that Lessee's Broker has confirmed its understanding and acceptance of the matters set forth in the provisions of this Section 31 above.

32.   Miscellaneous.

   (a)   Lessee shall maintain its Authority to Transact Business in the State of Illinois in good standing throughout the term hereof, and shall cause R. J. Reynolds Tobacco Company, a North Carolina corporation and the guarantor of Lessee's obligations hereunder (the "Guarantor"), to maintain its Authority to Transact Business in Illinois in good standing throughout the term hereof.  Lessee represents, and E. Scott Rhodes, Jr., in his capacity as Vice President of Lessee, hereby certifies, that (i) Lessee is authorized to use the assumed corporate name of "Marshall McGearty Tobacco Artisans" in the operation of Lessee's business at the Premises pursuant to a valid license from the Guarantor, which maintains such assumed corporate name registration on file with the Secretary of State of Illinois, and (ii) Lessee reasonably anticipates that Lessee will continue to have the right to so use such assumed corporate name throughout the term hereof. At all times during the term hereof while Lessee is operating its business at the Premises under the assumed corporate name of Marshall McGearty Tobacco Artisans, Lessee shall either maintain, or cause the Guarantor to maintain, an active registration for such assumed corporate name with the Secretary of State of Illinois; provided, however, that if and for so long as the Guarantor, instead of Lessee, continues to so maintain said assumed corporate name registration,

Lessee shall have licensed from the Guarantor the right to use such assumed corporate name and all necessary related trademarks and trade names in connection with the operation of Lessee's business at the Premises. Prior to any and each such time as Lessee may begin to operate its business at the Premises, or any portion thereof, under a name other than "R. J. Reynolds Smoke Shop," "R. J. Reynolds Smoke Shop, Inc.," or "Marshall McGearty Tobacco Artisans," and within thirty (30) days after any and each such time as Lessee changes its true corporate name, Lessee shall submit to Lessor a copy or copies of one or more documents from the Secretary of State of Illinois verifying that Lessee is authorized to conduct business in Illinois under such different name as an assumed corporate name or, as the case may be, a new true corporate name.

(b)    This lease represents the entire agreement between the parties hereto with respect to the subject matter hereof.

(c)    This lease may not be amended or modified, nor may any term or provision hereof be waived or discharged, except by a written instrument signed by the party against whom enforcement thereof may be sought.

IN WITNESS WHEREOF, this Store Lease, including the form part hereof, this Rider, and the exhibits hereto, has been executed on the date(s) set forth below, as of the date first above written.

LESSOR:                                LESSEE:

F.A.Y. PROPERTIES, INC.                R. J. REYNOLDS SMOKE SHOP, INC.

By _____            By _____
    Nathaniel T. Grey                     E. Scott Rhodes, Jr.
    President                             Vice President

Date _____6/21/06_____,            Date __6.22.06__
    said date being the date of
    full execution and delivery
    hereof

G:\GASS\RealEst\ChgoProps\Helmt Garg\Leases\RJ Reynolds Smoke Shop\RJ Reynolds Lse Rider draft 3 for execution.doc

GUARANTY

In consideration of Lessor's entering into the above lease, and to induce Lessor to enter into such lease, the undersigned guarantor (the "Guarantor") hereby (i) guarantees the payment and collection of all rents and other sums required to be paid by Lessee under the above lease, (ii) guarantees the performance by Lessee of all the terms, conditions, covenants, and agreements applicable to Lessee thereunder, and (iii) promises to pay all of Lessor's reasonable expenses, including, without limitation, reasonable attorneys' fees and costs, as may be incurred by Lessor in enforcing the obligations of Lessee thereunder or as may be incurred by Lessor in enforcing this Guaranty.

The Guarantor hereby waives all rights to notice of any Lessee defaults under the above lease.  Whether made with or without notice to the Guarantor, neither

   (i) Lessor's consent to any changes of control of the ownership of any Lessee under the above lease which is a corporation, limited liability company, general or limited partnership, or other entity, or of any parent of such Lessee, or to any subsequent changes of control of the ownership of any such Lessee or parent of such Lessee, nor

  (ii) Lessor's consent to any subleases or assignments of the above lease by any such Lessee or such Lessee's assigns, nor

 (iii) Lessor's consent to any changes or different use of the Premises, nor

  (iv) Lessor's forbearance, delays, or extensions of time in respect of the above lease and/or this Guaranty (or any other guaranty) for any reason, nor

   (v) any other act of Lessor or anyone on behalf of Lessor,

shall, in the absence of an express written waiver and/or release to such effect signed by Lessor, in any manner relieve or release the Guarantor of or from its obligations and liability as guarantor as aforesaid.

The Guarantor hereby represents that (i) it is the sole shareholder of Lessee, and as such has a stake in the welfare, success, and viability of Lessee, (ii) the Guarantor's sole shareholder is R.J. Reynolds Tobacco Holdings, Inc., a Delaware corporation that is a wholly-owned subsidiary of Reynolds American Inc., a publicly-held North Carolina corporation for which filings with the Securities Exchange Commission and consolidated financial statements are publicly available, and (iii) the Guarantor is a North Carolina corporation and is the principal operating subsidiary (albeit an indirect subsidiary) of said Reynolds American Inc.  The Guarantor hereby acknowledges that Lessor has relied on information contained in such publicly available filings and financial statements in accepting this Guaranty and entering into the above lease without a security deposit.

This Guaranty shall be binding upon the respective successors and assigns of the Guarantor.

Except as the context may otherwise require, all capitalized terms used in this Guaranty have the same meanings given them in the above lease.

IN WITNESS WHEREOF, this Guaranty, dated as of April 6, 2006, has been executed by the Guarantor contemporaneously with execution of the above lease.

GUARANTOR:

R. J. REYNOLDS TOBACCO COMPANY

By _____

Printed Name _____

Title _____

Date _____

EXHIBIT A

### The Premises

(The Premises are outlined in red below.)



EXHIBIT B

Supporting Statement for 2005 Base Year Insurance Premiums

**RAVID &**
**BERNSTEIN LLP**

*Certified Public Accountants*

♦ John V. Basso, CPA
♦ William H. Brock, CPA
♦ Mark T. Jason, CPA
♦ Phillip C. Ravid, CPA

April 26, 2006

Mr. Jordan Grey
Grey, Grey & Baltz, P.C.
11 South LaSalle Street, Suite 1320
Chicago, Il 60603-1209

Re: 2005 Building Insurance Premiums for
3155-63 North Broadway, Chicago, IL 60657

Dear Mr. Grey:

The total cost of the Building Insurance premiums incurred for the calendar year 2005 for 3155-63 North Broadway Avenue, Chicago, IL is $5,668. Of this cost, $4,043 is for property insurance covering the Building on the property (including loss of rents or business income coverage), and $1,624 is for the public/commercial general liability insurance (including excess liability coverage) for the Building protecting the landlord's interests.

Sincerely yours,

William H. Brock, CPA

S:\Brock\Clients\Bud_Gass\GASS\GASS2005\05 Ins Alert 3155_63NBroadway.doc

230 West Monroe Street   ♦   Suite 330   ♦   Chicago, IL 60606   ♦   Tel. 312/782 4710   ♦   Fax 312/782 4711

# STORE LEASE

THIS INDENTURE, made as of April 6, 2006, Witnesseth:

**F.A.Y. Properties, Inc., an Illinois corporation**                                                          , **Lessor,**
hereby leases unto
**R. J. Reynolds Smoke Shop, Inc., a Delaware corporation,** of itself and doing business as **Marshall McGearty Tobacco Artisans**           , **Lessee,**
and Lessee hereby accepts, the Premises known as the ground floor store premises having the address 3155 North Broadway Avenue, Chicago, Illinois 60657, as shown on Exhibit A attached hereto and made a part hereof (the "**Premises**") (the building at 3155 North Broadway Avenue, Chicago, Illinois, of which the Premises are a part, being hereinafter referred to as the "**Building**"), for the term of **five (5) years**, commencing June 1, 2006, and ending May 31, 2011, **unless commencing later or sooner terminated as provided herein**, to be occupied and used by Lessee solely for the purpose of operating a retail store utilized primarily for the sale of tobacco products and accessories and in which the sale of other products is merely incidental and where no one under 18 years old is permitted. Such "other products" shall consist of a limited selection of food and beverages, including, among other things, cheese plates, alcoholic drinks, and espresso drinks. **The sale and consumption of alcoholic drinks at the Premises shall be permitted only as an accessory use pursuant to the terms and provisions of the Chicago Zoning Ordinance. To the extent permitted by law, smoking shall be permitted in the Premises, provided that neither smoke nor odors from the Premises shall infiltrate into any areas outside of the Premises. Except as expressly provided in Section 22(e) hereof, Tenant shall not be relieved of any of its obligations under this lease, whether in respect of rents due hereunder or otherwise, in the event applicable federal, state, or local law at any point prohibits or further restricts the aforesaid use of the Premises in any respect.**

### In Consideration Thereof, the Parties Covenant and Agree:

1. **RENT:** Lessee shall pay to Lessor or as designated in writing by Lessor to Lessee, in coin or currency which, at the time or times of payment, is legal tender for public and private debts in the United States of America, at 900 West Jackson Blvd., Suite 4W, Chicago, IL 60607, or elsewhere as designated from time to time by Lessor's notice, the sums payable hereunder as rent, within ten (10) days after Lessor renders statements of account therefor unless otherwise provided herein or therein. The sums payable hereunder, as set forth at Section 19 hereof (and, if applicable, Section 22(c) hereof) as Base Rent, at Section 20 hereof as Real Estate Tax Rent and Insurance Rent, and elsewhere herein if payable as additional rent, are sometimes hereinafter together called "**Rent**." Lessee shall be required to pay to Lessor when accrued, as additional rent hereunder, a late charge of four percent (4%) of each required monthly installment of Base Rent, and/or of each required monthly payment of any Real Estate Tax Rent, Insurance Rent, and/or any other additional Rent, that Lessee receives after the fifth (5th) day of the month in which such monthly installment and/or payment is due and payable. All unpaid Rent shall bear interest at the rate of fifteen percent (15%) per annum from the date due until paid, and such interest shall be payable when accrued, as additional rent hereunder.

2. **SERVICES AND UTILITIES:** Lessor shall furnish cold water to the Premises from city mains through existing pipes, but, in the event Lessor at any time determines that Lessee's water usage at the Premises is greater than the water usage of any other tenant in the Building, then, upon Lessor's written request, Lessee shall nevertheless arrange to receive, and shall fully pay directly to the City of Chicago (or other proper authority) as additional Rent hereunder, the water bills for the Building. If Lessee does so pay the water bills for the Building, Lessor shall, at least reasonably, reimburse Lessee, or give Lessee a rent credit, in the amount of Lessor's best reasonable estimate of the cost of water used by the other tenants in the Building. If Lessee shall not be so required hereunder to pay the water bills for the Building directly to the City of Chicago (or other proper authority), Lessor shall pay all water bills at such cold water an additional Rent at rates fixed by Lessor based on Lessor's reasonable estimate of the average monthly cost of such cold water furnished to the Premises, the initial such charge being $60.00 per month. Although water usage at the Premises can be reasonably determined by Landlord's periodic monitoring of sub-meters in other premises at the Building, Lessee may, at its sole cost and subject to the other provisions of this lease, install a water sub-meter in the Premises to measure and monitor on its own the water usage at the Premises, in which case further water charges for the Premises shall be based on readings from such sub-meter. Lessee shall pay for all electricity, gas, water, and other utilities used at or for the Premises during the term hereof and otherwise during any alterations, repairs and decorating made in the Premises at any time, whether or not in consequence of any default by Lessee. Lessee's failure to timely pay any such charge shall entitle Lessor, upon less than five days' notice, and in addition to any other remedies of Lessor, to discontinue furnishing the service not paid for, and no such discontinuance shall be deemed an eviction or disturbance of Lessee's use of the Premises or render Lessor liable to Lessee for damages or relieve Lessee from performance of Lessee's obligations hereunder. Lessor provides no janitor service in the Premises and does not warrant that any of the services and utilities above mentioned will be free from interruptions caused by war, insurrection, civil commotion, riots, government action, acts of God or the enemy, repairs, renewals, improvements, alterations, picketing (whether legal or illegal), accidents, inability of Lessor to obtain fuel or supplies, or any other cause or causes beyond the reasonable control of Lessor. Any such interruptions shall never be deemed an eviction or disturbance of Lessee's use and possession of the Premises or any part thereof, or render Lessor liable to Lessee for damages or relieve Lessee from full performance of Lessee's obligations under this lease.

3. **LESSOR'S TITLE:** Nothing herein contained shall empower Lessee to do any act that can, may or shall cloud or encumber Lessor's title. Lessee's rights are and shall always be subordinate to the lien of any mortgage or mortgages hereafter placed upon the Building or any underlying leasehold estate and to all advances hereafter to be made upon the security thereof, and Lessee shall execute such further instruments subordinating this lease to the lien or liens of any such mortgage or mortgages or to any such underlying lease or leases as shall be requested by Lessor. Notwithstanding the foregoing, Lessee's rights hereunder shall not be subordinated to the lien of any such mortgage which may be placed on the Building unless Lessor, at Lessee's request, obtains and furnishes to Lessee a non-disturbance agreement from the future mortgagee on commercially reasonable terms. There currently is no mortgage on the Building. Lessor's demise, if any, of subsidewalk space, or of any space outside of the lien of the lot or lots whereon the Building stands, conveys only Lessor's rights therein. If, at any time during the term, any municipality or public authority shall (a) take possession of all or any part of such space, this lease shall continue without abatement or diminution of Rent; (b) require compensation for such space, Lessee will pay to Lessor amount or amounts equal thereto during comparable portions of the term hereof. This lease does not grant any rights to light or air over property except over public streets, alleys or ways kept open by public authority.

4. **RESERVED RIGHTS:** Lessor reserves the following rights: (a) To change the name or street address of the Premises or the Building without notice or liability of Lessor to Lessee. (b) To install and maintain a sign or signs on the exterior of the Building; provided that no such sign shall unreasonably interfere with the visibility of any sign or window display of Lessee that Lessor approved in writing. (c) To exhibit the Premises to prospective tenants, purchasers or others. (d) To display during the last ninety days of the term without hindrance or molestation by Lessee "For Rent" and similar signs on windows or elsewhere in or on the Premises or the Building; provided that no such sign shall unreasonably interfere with the visibility of any sign or window display of Lessee that Lessor approved in writing. (e) During the last ninety days of the term or any part thereof, if during or prior to that time Lessee vacates the Premises, or at any time

after Lessee abandons the Premises, to enter and decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy. (f) To take any and all measures, including inspections, repairs, alterations, additions and improvements to the Premises or to the Building as may be necessary or desirable for the safety, protection or preservation of the Premises or of the Building or Lessor's interests, or as may be necessary or desirable in the operation of the Building. Lessor may enter upon the Premises and may exercise any or all of the foregoing rights hereby reserved without being deemed guilty of an eviction or disturbance of Lessee's use or possession and without being liable in any manner to Lessee.

5. **DEFAULT UNDER OTHER LEASE:** If the term of any lease, other than this lease, made by Lessee with Lessor be terminated or terminable after the making of this lease because of any default by Lessee under such other lease, that fact shall empower Lessor, at Lessor's sole option, (a) to terminate this lease and/or Lessor's right to possession of the Premises, and/or (b) to add any sums due to Lessor under the other lease to the Rent payable under this lease. The exercise of such rights because Lessee shall constitute a default by Lessee under this lease. Lessee under any such other lease shall constitute a default by Lessee under this lease.

6. **WAIVER OF CLAIMS:** To the extent permitted by law, Lessee releases Lessor and Lessor's agents and servants from, and waives, all claims for damage to person or property sustained by Lessee or any occupant of or guest of the Building or the Premises resulting from the Building or the Premises or any part of either or any equipment or appurtenance becoming out of repair, or resulting from any accident in or about the Building, or resulting directly or indirectly from any act or neglect of any tenant or occupant of the Building or of any other person, including Lessor's agents and servants. This Section 6 shall apply especially, but not exclusively, to the flooding of basements or other subsurface areas, and to damage caused by refrigerators, sprinkling devices, computers, electronic equipment, air-conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures, and shall apply equally whether any such damage results from the act or neglect of Lessor or of other tenants, occupants or servants in the Building or of any other person, and whether such damage be caused or result from any thing or circumstance above mentioned or referred to, or any other thing or circumstance, whether of a like nature or of a wholly different nature. If any such damage, whether to the Premises or to the Building or any part thereof, or whether to Lessor or to other tenants in the Building, results from any act or neglect of Lessee, Lessor may, at Lessor's option, repair such damage, and Lessee shall, upon demand by Lessor, reimburse Lessor forthwith for the total cost of such repairs. Lessee shall not be liable for any damage caused by its act or neglect if Lessor or another tenant in the Building has recovered the full amount of the damages from insurance and Lessor's insurance company has waived in writing its right of subrogation against Lessee. All property belonging to Lessee or any occupant of the Premises that is in the Building or the Premises shall be there at the risk of Lessee or such other person only, and, to the extent permitted by law, Lessor shall not be liable for damage thereto or theft or misappropriation thereof.

7. **HOLDING OVER:** If Lessee retains possession of the Premises or any part thereof after the termination of the term by lapse of time or otherwise, Lessee shall pay Lessor Rent at double the last rate of rental specified herein and interest thereon, as specified in Section 1, for the time Lessee thus remains in possession, and in addition thereto, shall pay Lessor all damages sustained by reason of Lessee's retention of possession. If Lessee remains in possession of the Premises or any part thereof after termination of the term by lapse of time or otherwise, such holding over shall, at the election of Lessor, expressed in a written notice to Lessee and not otherwise, constitute a renewal of this lease for one year at such higher rental. Lessor's acceptance of any rent after holding over does not renew this lease. The provisions of this section do not waive Lessor's rights of reentry or any other right hereunder.

8. **SUBLETTING, ASSIGNMENT, OR TRANSFER OF CONTROL:** Except with Lessor's prior written consent, which shall not be unreasonably withheld or delayed, Lessee shall not allow or permit any transfer of this lease or any interest under it or any lien upon Lessee's interest by operation of law, or assign or convey this lease or any interest under it, or sublet the Premises or any part thereof, or permit the use or occupancy of the Premises or any part thereof by anyone other than Lessee. Lessor shall not be deemed to have unreasonably withheld or delayed its consent to any request by Lessee for a sublease of less than the entire Premises. If Lessee (including any Lessee/assignee) is a corporation, limited liability company, partnership, or, other entity, and if, during the term of this lease, an ownership interest which constitutes control of Lessee changes by reason of sale, gift, or otherwise without Lessor's prior written consent, which shall not be unreasonably withheld or delayed, Lessor may at any time thereafter terminate this lease and/or Lessee's right to possession of the Premises by giving Lessee written notice of such termination at least sixty days prior to the date of termination stated in the notice. The receipt of rent after any such change of control shall not affect Lessor's rights under the preceding sentence. In the event of an assignment of this lease by Lessee, neither the assignor/Lessee nor any guarantor(s) of Lessee's obligations hereunder shall be released from any of their respective obligations under this lease or the guaranty thereof.

9. **CONDITION OF THE PREMISES:** Lessee has examined the Premises, and the mechanical equipment and Building systems serving the Premises, before signing this lease. Lessee is satisfied with the condition thereof, except for any such alterations, improvements, repairs, decorating and cleaning as Lessor may be specifically required to perform under express provisions hereof. Lessee's taking possession shall be conclusive evidence as against Lessee that the Premises and the mechanical equipment and Building systems serving the Premises were in good order and satisfactory condition when Lessee took possession hereunder. No promise of Lessor to alter, remodel, improve, repair, decorate or clean the Premises or any part thereof, and no representation respecting the condition of the Premises or the Building, has been made by

EXHIBIT

1

Lessor to Lessee, unless the same is contained herein or made a part hereof. At the termination of this lease by lapse of time or otherwise, Lessee shall return the Premises and all equipment and fixtures therein in as good condition as when Lessee took possession, and all subsequent work thereon was completed, ordinary wear and tear excepted, failing which Lessor may restore the Premises, equipment and fixtures to such condition and Lessee shall pay the cost thereof upon request. (See Section 23 hereof.)

10. ALTERATIONS: Lessee shall not make any alterations in or additions to the Premises without Lessor's advance written consent in each and every instance. Lessor's decision to refuse such consent shall be conclusive, but shall not be unreasonably withheld or delayed. If Lessor consents to such alterations or additions, then, before commencement of the work or delivery of any materials onto the Premises or into the Building, Lessee shall furnish Lessor with plans and specifications, names and addresses of contractors, copies of contracts, necessary permits and indemnifications, in form and amount satisfactory to Lessor, against any and all claims, costs, damages, liabilities and expenses which may arise in connection with the alterations or additions. Whether or not Lessor shall have furnished Lessor the foregoing, Lessee hereby agrees to hold Lessor harmless from any and all liabilities of every kind and description which may arise out of or be connected in any way with said alterations or additions. All additions and alterations shall be installed in a good, workmanlike manner, and only new, high-grade materials shall be used. Before commencing any work in connection with alterations or additions, Lessee shall furnish Lessor with certificates of insurance from all contractors performing labor or furnishing materials insuring Lessor against any and all liabilities that may arise out of or be connected in any way with said additions or alterations. Lessee shall pay the cost of all such alterations and additions and also the cost of decorating the Premises occasioned by such alterations and additions. Upon completing any alteration or additions, Lessee shall furnish Lessor with contractors' affidavits and full and final waivers of lien and receipted bills covering all labor and materials expected and used. All alterations and additions shall comply with all insurance requirements and with all ordinances and regulations of the City of Chicago or any department or agency thereof and with the requirements of all statutes and regulations of the State of Illinois or of any department or agency thereof. Lessee shall permit Lessor to inspect and/or supervise construction operations in connection with alterations or additions if Lessor requests to do so. All additions, hardware, non-trade fixtures and all improvements, temporary or permanent, in or upon the Premises, whether placed there by Lessee or by Lessor, shall, unless Lessor requests their removal, become Lessor's property and shall remain upon the Premises at the termination of this lease by lapse of time or otherwise, without compensation or allowance or credit to Lessee. If, upon Lessor's request, Lessee does not remove said additions, hardware, non-trade fixtures and improvements, Lessor may remove the same and the Lessee shall pay the cost of such removal to Lessor upon demand. If Lessee does not remove all of Lessee's furniture, floor coverings, trade fixtures and other personal property of all kinds from the Premises prior to the end of the term, however ended, Lessee shall be conclusively presumed to have conveyed the same to Lessor under this lease as a bill of sale without further payment or credit by Lessor to Lessee. (See Section 24 hereof.)

11. USE OF PREMISES: (a) Lessee shall occupy and use the Premises during the term for the purpose(s) above specified and none other, conducting Lessee's customary business activity therein during all usual days and hours for the business in the vicinity, except when prevented by strikes, fire, casualty or other causes beyond Lessee's reasonable control and except during reasonable periods for the repair, cleaning and decorating of the Premises. (b) Except as specifically provided herein and then only upon strict compliance with such provisions, Lessee shall not manufacture, distribute, store, sell, permit consumption of, or give away in, on, or from the Premises, any alcoholic liquor, as defined in the Illinois Liquor Control Act approved January 31, 1934, as amended. (c) Lessee shall not exhibit, sell or offer for sale, use, rent or exchange in the Premises or in the Building any article, thing or service except those ordinarily embraced within the stated use of the Premises. (d) Lessee will not make or permit to be made any use of the Premises or of any other part of the Building and surrounding areas which, directly or indirectly, is forbidden by public law, ordinance or governmental or municipal regulation or order, or which may be dangerous to life, limb or property, or which may invalidate or increase the premium cost of any policy of insurance carried on the Building or covering its operations. Lessee shall not keep or use, or permit to be kept or used, in or on the Premises or any part of the Building and surrounding properties in which it may have access from time to time, any gasoline or other flammable fluids or explosives. (e) Lessee will comply with all requirements for state, municipal or other governmental inspections, licenses and permits and will promptly pay all proper fees and charges in connection therewith (including, without limitation, any and all permits, fees, and charges which respect to signage, any awning, and/or any other fixture and/or the Premises as may encroach upon or hang over the public right-of-way), failing which Lessor may, but need not, pay any and all such fees and charges for the account of Lessee. (f) Lessee shall keep all first floor street frontage show windows brightly lighted during the term from dusk of each day until 4:00 A.M. including Sundays and holidays. (g) Lessee shall not display, install, inscribe, paint or affix any sign, banner, picture, advertisement or notice inside or outside the Premises or the Building except in such place or places and of such shape, size, color, design, content, style, material, quality, and make as shall have advance written approval by Lessor, which approval shall not be unreasonably withheld, and, upon expiration of the term, whether by lapse or otherwise, Lessee shall remove all such signs, banners, pictures, advertisements and notices. Lessee shall bear the responsibility and cost for maintaining and insuring same as appropriate and for complying with all laws and regulations with respect to the same. At the request of Lessee, Lessor shall remove any and all signs, banners, pictures, advertisements and notices that Lessor at any time reasonably considers objectionable or injurious to the Building or the Premises. (h) Lessee shall not use the name of the Premises or the Building for any purpose other than Lessee's business address. Lessee may use any picture or likeness of the Building or the Premises in any advertisements, notices or correspondence; provided, however, that Lessee shall promptly cease using any such likeness or picture on Lessor's request. (i) Lessee shall promptly remove snow and ice from the sidewalks in front of the Premises, and shall keep all sidewalks, entrances, passages, courts, corridors, vestibules, halls, approaches, exits, elevators and stairways in front of, adjoining, or in the rear of the Premises free from all obstructions of every kind, and from ashes, grease, garbage, litter and refuse of every kind, and in a clean and sanitary condition. (j) Lessee shall keep all windows of the Premises clean, and shall maintain the front of the Premises in an attractive condition. (k) Lessee shall not make or permit any smoke, noise or odor that is objectionable to the public, to other occupants of the Building, to emanate from the Premises and shall not create or maintain a nuisance thereon, and shall not disturb, solicit or canvas any occupant of the Building, and shall not do any act tending to injure the reputation of the Building or the Premises. (l) Lessee shall not place or permit any radio or television antennae, satellite dish, loud speakers, sound amplifiers or other similar devices on the roof or outside of the Building. (m) Lessee shall not waste water by tying, wedging or otherwise fastening open any faucet. (n) Upon termination of the lease or of Lessee's possession, Lessee shall surrender all keys to the Premises to Lessor at the place then fixed for the payment of Rent and shall make known to Lessor the explanation of all security codes for the Premises and all combination locks on safes, cabinets and vaults in the Premises. (o) As to any awnings, showcases, shades, Venetian blinds or window or door coverings of any kind, whether inside or outside, as Lessee may desire, Lessee shall insure the same and furnish and maintain the same in good and attractive condition at Lessee's expense and risk, and all shall be of shape, size, color, design, content, style, material, quality and make as shall first be approved by Lessor in writing and as shall thereafter continue to be subject to the approval of Lessor, such approval not to be unreasonably withheld or withdrawn. (p) Lessee shall not overload any floor; Lessor may direct the routing and location of safes and all heavy articles. (q) Unless Lessor gives advance written consent, Lessee shall not use the Premises for any part thereof for housing accommodations or for lodging or sleeping purposes. Lessee shall not do any cooking therein (except that food may be warmed in a microwave or high-quality commercial electric toaster oven in connection with the permitted use of the Premises), and Lessee shall not use any illumination other than electric light. (r) Lessee shall not take or permit to be taken any supplies, merchandise, fixtures, furniture, equipment, or appliances in or out of the Premises or the Building except through proper service doors designated by Lessor from time to time, and in any event without interfering with any other occupants of the Building or the

adjoining properties. (s) Lessee shall maintain the temperature in the Premises high enough to prevent the freezing of water in plumbing fixtures and all other damage caused by low temperature. (t) Unless Lessor gives advance written consent, neither Lessee, nor any trustee, receiver, assignee or any other person acting for or on behalf of Lessee, or Lessee's estate or creditors, shall conduct an auction in the Premises. (u) Lessee shall not bring or permit any pet or animals in the Premises or elsewhere in the Building. (v) In addition to all other liabilities for breach of any covenant of this Section 11, Lessee shall pay to Lessor all damages caused by such breach and shall also pay to Lessor an amount equal to any increase in insurance premium or premiums caused by such breach. Lessee's violation of any covenant in this Section 11 or Section 25 hereof may be restrained by injunction.

12. REPAIRS AND MAINTENANCE: Subject to the provisions of Section 13 hereof Lessee shall, during the term, at Lessee's own expense, keep the Premises sanitary, clean, and in good order, condition and repair, including the replacement of all broken glass with glass of the same size and quality, under the supervision and with the approval of Lessor. If Lessee does not make repairs promptly and adequately, Lessor may, but need not, make repairs, and Lessee shall pay promptly the reasonable cost thereof as additional rent, including overtime and other expenses if Lessor, at Lessee's request, makes such repairs, including decorating, at times other than ordinary business or labor hours. At any time or times, Lessor, either voluntarily or pursuant to governmental requirement, may, at Lessor's own expense, make repairs, alterations or improvements in or to the Building or any part thereof, including the Premises, and, during operations, may do all things necessary in connection therewith, all without any liability to Lessee by reason of interference, inconvenience, annoyance or loss of business. To the extent permitted by law, Lessor shall not be liable to Lessee for any expense, injury, loss or damage resulting to Lessee from work done in, upon or along, or from the use of, any adjacent or nearby building, land, street, sidewalk, alley or way. (See Sections 24 and 25 hereof.)

13. UNTENANTABILITY: (a) If the Premises or the Building are made wholly untenantable by fire or other casualty, Lessor may elect (a) to terminate this lease as of the date of the fire or casualty by notice to Lessee within thirty days after that date, or (b) to repair, restore or rehabilitate the Building or the Premises at Lessor's expense within one hundred eighty days after Lessor is enabled to take possession of the injured Premises and to undertake reconstruction or repairs, in which latter event this lease shall not terminate but Rent shall be abated on a per diem basis while the Premises are untenantable. If Lessor elects so to repair, restore or rehabilitate the Building or Premises and does not substantially complete the work within the one hundred eighty day period, either party can terminate this lease as of the date of the fire or casualty by notice to the other party not later than one hundred twenty days after Lessor is enabled to take possession of the injured Premises and to undertake reconstruction or repairs. In the event of termination of this lease pursuant to this Section 13, all Rents shall be apportioned on a per diem basis and be paid to the date of the fire or casualty. If the Premises shall be partially damaged by fire or other casualty without the fault or negligence of Lessee or Lessee's servants, employees, agents, visitors or licensees, the Premises shall be repaired, restored or rehabilitated by Lessor and, if an to the extent Lessee is not insured or required to be insured for such damage, at the expense of Lessor, and all Rents until the damaged portion of the Premises is ready for occupancy by Lessee shall be apportioned according to the part of the Premises which is usable by Lessee. In all cases, due allowance shall be made for reasonable delay which may be caused by adjustment of insurance, strikes, labor difficulties or any cause beyond Lessor's control.

14. EMINENT DOMAIN: If the Building, or any portion thereof which includes a substantial part of the Premises, or which prevents the operation of the Building, shall be taken or condemned by any competent authority for any public use or purpose, the term of this lease shall end upon, and not before, the date when the possession of the part so taken shall be required for such use or purpose, and without apportionment of the condemnation award. Lessee shall have no right to share in such award. All Rents shall be apportioned as of the date of such termination. If any condemnation proceeding shall be instituted in which it is sought to take or damage any part of the Building, with or without the underlying land, or if the grade of any street or alley adjacent to the Building is changed by any competent authority and such change of grade makes it necessary or desirable to remodel the Building to conform to the changed grade, Lessor sha have the right to cancel this lease upon not less than ninety days' notice prior to the date of cancellation designated in the notice. No money or other consideration shall be payable b Lessor to Lessee for the right of cancellation, and Lessee shall have no right to share in the condemnation award or in any judgment for damages caused by the change of grade.

15. REMEDIES: All rights and remedies of Lessor herein enumerated shall be cumulative and none shall exclude any other right or remedy allowed by law.

   (a) If any voluntary or involuntary petition or similar pleading under any section or sections of any bankruptcy act shall be filed by or against Lessee, or any voluntary or involuntary proceeding in any court or tribunal shall be instituted to declare Lessee insolvent or unable to pay Lessee's debts, and in the case of an involuntary petition or proceeding, the petition or proceeding is not dismissed within thirty days from the date it is filed, Lessor may elect, but is not required with or without notice of such election, and with or without entry or other action by Lessor, to forthwith terminate this lease, and notwithstanding any other provisions of this lease, Lessor shall forthwith upon such termination be entitled, to the extent permitted by law, to retrieve possession of the Premises and to recover damages in an amount equal to the then present valu of the Rent specified in Section I of this lease for the residue of the stated term hereof, less the fair rental value of the Premises for the residue of the stated term; provided, however, the termination of this lease under this provision shall not operate to increase or diminish the liabilit of the guarantors under the written guaranty hereof.

   (b) If Lessee defaults in the payment of Rent and such default continues for five days afte Lessor's notice thereof to Lessee as provided herein, or if Lessee defaults in the prompt and fu performance of any other provision of this lease, and Lessee does not cure the default withi twenty days (or forthwith, if the default involves a hazardous condition) after written demand b Lessor that the default be cured, Lessor may, if Lessor so elects, but not otherwise, forthwit terminate this lease and Lessee's right to possession of the Premises, one or both. If the leasehol interest of Lessee be levied upon under execution or be attached by process of law, or if Lesse makes an assignment for the benefit of creditors, or if a receiver be appointed for any property o Lessee, or if Lessee abandons the Premises, then and in any such event Lessor may, if Lessor s elects, but not otherwise, and with or without notice of such election and with or without a demand whatsoever, either forthwith terminate this lease and Lessee's right to possession of th Premises or, without terminating this lease, forthwith terminate Lessee's right to possession o the Premises. (See Section 28 hereof.)

   (c) Upon any termination of this lease, whether by lapse of time or otherwise, or upon an termination of Lessee's right to possession without termination of the lease, Lessee sha immediately vacate the Premises and surrender possession thereof to Lessor.

   (d) If Lessee abandons the Premises or otherwise defaults hereunder, thereby entitlin Lessor so to elect, and Lessor elects to terminate Lessee's right to possession only, withou terminating the lease, Lessor may at Lessor's option, to the extent permitted by law, enter into th Premises, remove Lessee's property and other evidences of tenancy, and take and hold possessio thereof as in paragraph (c) of this Section 15 provided, without such entry and possessio terminating this lease or releasing Lessee, in whole or in part, from Lessee's obligation to pay th Rent hereunder for the full term and other sums due hereunder. Upon and after entry int possession without termination of the lease, Lessor may, but, except as required by law, nee not, relet the Premises or any part thereof for the account of Lessee to any person, firm o corporation other than Lessee for such Rent, for such time and upon such terms as Lessor Lessor's sole discretion shall determine. Lessor shall not be required to accept any tenant offere by Lessee or to observe any instructions given by Lessee about such reletting. In any such cas Lessor may make repairs, alterations and additions in or to the Premises, and redecorate the sam to the extent reasonably deemed by Lessor necessary or desirable, and Lessee shall, upo demand, pay the cost thereof, together with Lessor's reasonable expenses of the reletting. If th consideration collected by Lessor upon any such reletting for Lessee's account is not sufficient t pay monthly the full amount of the Rent reserved in this lease, together with the costs of repair alterations, redecorating and Lessor's expenses, Lessee shall pay to Lessor the amoun of each monthly deficiency upon demand.

2

(e)  Lessee shall pay upon demand all of Lessor's costs, charges and expenses, including the reasonable fees of counsel, agents and others retained by Lessor, incurred in enforcing Lessee's obligations hereunder or incurred by Lessor in any litigation, negotiation or transaction in which Lessee causes Lessor, without Lessor's fault, to become involved or concerned.

(f)  In event any lien upon Lessor's title results from any act or neglect of Lessee, and Lessee fails to remove said lien within ten days after Lessor's notice to do so, Lessor may remove the lien by paying the full amount thereof or otherwise and without any investigation or contest of the validity thereof, and Lessee shall pay Lessor as additional rent, upon request, the amount paid out by Lessor in such behalf, including Lessor's costs, expenses and counsel fees, and interest thereon.

16.  NOTICES:  In every instance where it shall be necessary or desirable for Lessor to serve any notice or demand upon Lessee, it shall be sufficient, to the extent permitted by law, (a) to deliver or cause to be delivered to Lessee a written or printed copy thereof, or (b) to send a written or printed copy thereof by United States certified or registered mail, postage prepaid, addressed to Lessee at the Premises, in which event the notice or demand shall be deemed to have been served at the time the copy is mailed, or (c) to leave a written or printed copy thereof with some person above the age of thirteen years in possession of the Premises or to affix the same upon any door leading into the Premises, in which event the notice or demand shall be deemed to have been served at the time the copy is so left or affixed.  All such notices shall be signed by or on behalf of Lessor.  (See Section 30 hereof.)

17.  MISCELLANEOUS:

(a)  No receipt of money by Lessor from Lessee after the termination of this lease or of Lessee's right to possession of the Premises, after the service of any notice, after the commencement of any suit, or after final judgment for possession of the Premises, shall renew, reinstate, continue or extend the term of this lease or affect any such notice, demand or suit.

(b)  No waiver of any default of Lessee hereunder shall be implied from any omission by Lessor to take any action on account of such default if such default persists or be repeated, and no express waiver shall affect any default other than the default specified in the express waiver and that only for the time and to the extent therein stated.  The invalidity or unenforceability of any provision hereof shall not affect or impair any other provision.

(c)  In the absence of fraud, no person, firm or corporation, or the heirs, legal representatives, successors and assigns, respectively, thereof, executing this lease as agent, trustee or in any other representative capacity, shall ever be deemed or held individually liable hereunder for any reason or cause whatsoever.

(d)  The words "Lessor" and "Lessee" wherever used in this lease shall be construed to mean Lessors or Lessees in all cases where there is more than one Lessor or Lessee, and the necessary grammatical changes required to make the provisions hereof apply either to corporations (or other legal entities) or individuals, or to men or women, shall in all cases be assumed as though in each case fully expressed.

(e)  Provisions inserted herein or affixed hereto shall not be valid unless appearing in the duplicate original hereof held by Lessor.  In event of variation or discrepancy, Lessor's duplicate shall control.

(f)  Each provision hereof shall extend to and shall, as the case may require, bind and inure to the benefit of Lessor and Lessee and their respective heirs, legal representatives and successors, and shall bind and inure to the benefit of Lessor and Lessee and their respective assigns in the event this lease has been assigned by Lessor or in the event this lease has been assigned by Lessee with the express written consent of Lessor.

(g)  Submission of this instrument for examination does not constitute a reservation of or option for the Premises.  This instrument becomes effective as a lease only upon execution and delivery both by Lessor and Lessee.

(h)  The headings of sections of this lease are for convenience only, and do not define, limit or construe the contents of the sections.

(i)  All amounts (other than Rent) owed by Lessee to Lessor hereunder shall be paid within ten days from the date Lessor renders statements of account therefor and shall bear interest at the rate of fifteen percent (15%) per annum thereafter until paid.

(j)  Provisions typed on this lease and signed by Lessor and Lessee, and all riders attached to this lease and signed by Lessor and Lessee, are hereby made a part of this lease as though inserted at length in this part of this lease.

(k)  If Lessee shall occupy or otherwise have possession of the Premises prior to the beginning of the term of this lease with Lessor's consent, all the provisions of this lease shall be in full force and effect as soon as Lessee occupies or otherwise has possession of the term of this lease shall be fixed by agreement between Lessor and Lessee.

18.  RIDER:  The Rider attached hereto and made a part hereof is incorporated herein by this reference and contains Sections 19 through 32 hereof, inclusive.  In the event of any conflict between the provisions of Sections 1 through 18 of this lease and the provisions set forth in Sections 19 through 32 of this lease, the provisions of Sections 19 through 32 shall control.

In Witness Whereof, the parties hereto have caused this indenture to be executed under their seals, as of the date first above written.

LESSOR:

F.A.Y. PROPERTIES, INC.

By _____
Nathaniel J. Grey
President

LESSEE:

R. J. REYNOLDS SMOKE SHOP, INC.

By _E. Scott Rhodes, Jr._____
E. Scott Rhodes, Jr.
Vice President

3

RIDER ATTACHED TO AND MADE PART OF THE STORE LEASE,
DATED AS OF APRIL 6, 2006, BY AND BETWEEN
F.A.Y. PROPERTIES, INC., LESSOR,
AND R. J. REYNOLDS SMOKE SHOP, INC., OF ITSELF
AND DOING BUSINESS AS MARSHALL MCGEARTY TOBACCO ARTISANS, LESSEE,
FOR THE GROUND FLOOR STORE PREMISES AT
3155 NORTH BROADWAY AVENUE, CHICAGO, ILLINOIS 60657

19.   Base Rent.

(a)   The base rental ("Base Rent") payable by Lessee to Lessor
pursuant to Section 1 hereof for each Lease Year (as defined in Section
19(b) hereof) shall be as follows:

| Lease Year | Period | Total Base Rent for Period | Equal Monthly Installment of Base Rent |
|---|---|---|---|
| 1 | 06/01/06-08/31/06 | $0.00 | $0.00 |
| 1 | 09/01/06-05/31/07 | $ 81,000.00* | $ 9,000.00* |
| 2 | 06/01/07-05/31/08 | $111,240.00 | $ 9,270.00 |
| 3 | 06/01/08-05/31/09 | $114,600.00 | $ 9,550.00 |
| 4 | 06/01/09-05/31/10 | $118,020.00 | $ 9,835.00 |
| 5 | 06/01/10-05/31/11 | $121,560.00 | $10,130.00 |

*   See Section 19(b) hereof.

(b)   The Base Rent for each Lease Year shall be payable in equal
monthly installments, as indicated in Section 19(a) hereof (and, if
applicable, Section 22(c) hereof), in advance, promptly on the first
(1") day of each calendar month of such Lease year during the term
hereof; provided, however, that (i) contemporaneous with Lessee's
execution and delivery of this lease, Lessee shall have paid to Lessor
the $9,000.00 of Base Rent for the month of September 2006, but (ii) in
the event that, due to a holdover by the current tenant at the
Premises, Lessor is unable to tender possession of the Premises to
Lessee on or before June 1, 2006, (A) the Base Rent for the period from
and after September 1, 2006, shall be abated on a pro rata basis and
shall not be payable for any period prior to ninety (90) days after the
date Lessor tenders possession of the Premises to Lessee (the "Delayed
Rent Commencement Date"), (B) such pre-payment of Base Rent shall
instead be for the first full calendar month from and after the Delayed
Rent Commencement Date, or shall be promptly refunded to Lessee in the
event Lessee properly terminates this lease pursuant to Section 21(a)
hereof, and (C) if the Delayed Rent Commencement Date is on a day other
than the first day of a calendar month, Lessee shall pay in advance the
Base Rent for the balance of such calendar month on or before the
Delayed Rent Commencement Date, in an amount equal to the sum of
$300.00 per day for each day from and including the Delayed Rent
Commencement Date and the last day of such calendar month.  A "Lease
Year" hereunder is a consecutive 12-month period commencing on June 1
of each calendar year during the term hereof and ending on May 31 of
the following calendar year, except that, if the term of this lease
commences after June 1, 2006, the first Lease Year shall commence on
the day that Lessor tenders possession of the Premises to Lessee and
shall end on May 31, 2007.

20.   Real Estate Tax Rent and Insurance Rent.

(a)   (i)   In addition to the payments of Base Rent required of
Lessee hereunder, Lessee, in accordance with the provisions of this
Section 20 set forth below, shall be responsible for and shall pay to
Lessor as additional rent hereunder ("Real Estate Tax Rent") Lessee's
proportionate share of any increases in the cost of real estate taxes
("Real Estate Taxes") incurred by or for Lessor or Lessor's

affiliate(s) in respect of the improvements and land at 3155-63 North Broadway Avenue, Chicago, Illinois (the "Property"). The regular real estate taxes for the Property have heretofore been billed by and payable to the Cook County Collector under Permanent Index Number 14-28-102-007).

(ii)   Commencing on or about October 1, 2007 for the first Lease Year, and then, for each subsequent Lease Year, on or about October 1 of each calendar year thereafter through the calendar year in which the term hereof expires, or as soon as practicable after each such October 1 date, Lessor will calculate and, if owing, bill Lessee Real Estate Tax Rent for the applicable Lease Year in the sum of twenty-five percent (25%) of the amount, if any, by which (A) the Real Estate Taxes payable for the real estate tax assessment year in which such Lease Year begins exceed (B) the Base Year Real Estate Taxes. Lessee shall pay the Real Estate Tax Rent within ten (10) days after being billed therefor in each such instance. The "Base Year Real Estate Taxes" are the Real Estate Taxes that will be assessed and billed by the Cook County Collector for the 2005 real estate tax assessment year, but which are expected to be payable during calendar year 2006. Lessor shall furnish to Lessee, once available and upon Lessee's request, copies of the bills for Real Estate Taxes to be issued by the Cook County Collector for the Base Year Real Estate Taxes and any subsequent real estate tax assessment years for which Real Estate Tax Rent shall then be payable under this Section 20.

(b)   (i)   In addition to the payments of Base Rent and Real Estate Tax Rent required of Lessee hereunder, Lessee, in accordance with the provisions of this Section 20 set forth below, shall be responsible for and shall pay to Lessor as additional rent hereunder ("Insurance Rent") Lessee's proportionate share of any increases in the costs incurred by or for Lessor or Lessor's affiliate(s) for the following insurance (or the substantial equivalent thereof or the commercially acceptable substitute therefor), which shall be maintained by or for Lessor or Lessor's affiliate(s) during the term hereof in respect of the Property (the "Building Insurance"):

(A)   Property insurance, sometimes referred to as "direct physical loss or damage" property insurance (including, without limitation, fire and extended insurance coverage, with vandalism and malicious mischief endorsements), covering up to the full replacement cost value of the Building and Lessor's loss of rents or business income from the Building; and

(B)   Public liability insurance (including commercial general liability or similar liability insurance and any excess or umbrella liability insurance) for the Building, protecting Lessor's interests.

(ii)   Commencing in or after December 2006 for the first Lease Year, and then annually thereafter for each subsequent Lease Year, Lessor will calculate and, if owing, bill Lessee Insurance Rent for the applicable Lease Year in the sum of twenty-five percent (25%) of the amount, if any, by which (i) the total amount of the Building Insurance premiums incurred by Lessor for the calendar year in which such Lease Year begins exceeds (ii) the total amount of the Building Insurance premiums incurred by Lessor for calendar year 2005 (the "Base Year Insurance Premiums"), as provided in a supporting statement ("Supporting Statement") from Lessor's insurance agent, insurance counsel, insurance consultant, or accountant that is similar in form to the April 26, 2006 letter from Lessor's accountant indicating that the Building Insurance premiums were $5,668.00 for 2005, as calculated by such accountant, a copy of which letter is attached hereto as Exhibit B and made a part hereof. Lessee shall pay the Insurance Rent within ten (10) days after Lessor bills Lessee therefor in each such instance. Lessor shall furnish a Supporting Statement to Lessee with each such bill, and shall furnish a Supporting Statement to Lessee for the Base Year Insurance Premiums with the first such bill, if Lessor has not done so before then.

(c)   At Lessor's election made in writing to Lessee at any time, Lessor may thereafter require Lessee to pay Real Estate Tax Rent and/or Insurance Rent for any Lease Year, in advance, promptly on the first day of each calendar month during such Lease Year, whether or not Lessor renders a monthly statement of account therefor, in an amount equal to one-twelfth (1/12) of Lessor's best reasonable estimate(s) of

the Real Estate Tax Rent and/or Insurance Rent for such Lease Year, subject, however, to any "catch-up" or "credit back" adjustments under this Section 20(c) below. For each Lease Year (even if such Lease Year has already ended), after Lessor receives the bill for the second installment of Real Estate Taxes payable to the Cook County Collector for the real estate tax assessment year in which such Lease Year begins and/or receives a Supporting Statement for the calendar year in which such Lease Year begins, the total of such estimated monthly installments of Real Estate Tax Rent and/or Insurance Rent theretofore collected by Lessor for such Lease Year (and, if applicable, for the next Lease Year thereafter), shall be adjusted higher or lower, as the case may be, to reflect the full amount of the actual Real Estate Taxes payable for the real estate tax assessment year in which such Lease Year begins and/or the actual total amount of the Building Insurance premiums incurred by Lessor for the calendar year in which such Lease Year begins. Each such adjustment shall be made by Lessee's paying to Lessor (i.e., to "catch-up") any accumulated deficiency of Real Estate Tax Rent and/or Insurance Rent within ten (10) days after being billed therefor by Lessor, or, as the case may be, by Lessee's receiving a credit against the Real Estate Tax Rent and/or Insurance Rent payment(s) next due for any accumulated overpayment (i.e., to "credit back" Lessee).

(d)    Notwithstanding the foregoing provisions of this Section 20 providing for Lessee's share of increases in Building Insurance premiums to be 25%, Lessee shall pay Lessor Insurance Rent, in accordance with the provisions above, for one hundred percent (100%) of any increases in the Building Insurance premiums as shall be reasonably determined to be directly attributable to Lessee's use of the Premises for the sale and consumption of tobacco and alcoholic products and for smoking at the Premises, as confirmed by Lessor's insurer, insurance agent, or insurance consultant.

21.    Possession of the Premises.

(a)    In the event that, due to a holdover by the current tenant at the Premises, Lessor is unable to tender possession of the Premises to Lessee on or before June 1, 2006, the term of this lease shall not commence until Lessor actually tenders possession of the Premises to Lessee, which Lessor shall do as soon as reasonably practicable after Lessor shall have obtained possession of the Premises from such current tenant. If Lessor fails to tender possession of the Premises to Lessee on or before September 15, 2006, Lessee thereafter may terminate this lease by giving Lessor notice of such termination before Lessor tenders possession of the Premises to Lessee, whereupon Lessor shall promptly refund the Base Rent for the first full month of the term hereof that Lessee shall have pre-paid to Lessor. For purposes of this lease, Lessor shall be deemed to have tendered possession of the Premises to Lessee upon delivering to a representative of Lessee (which may be Lessee's broker) a key or keys to the Premises or, if earlier, upon giving Lessee or a representative of Lessee written notice that Lessor is prepared to give possession of the Premises to Lessee; provided, however, that in any event, Lessor need not give Lessee physical possession of the Premises unless and until Lessee shall have furnished to Lessor evidence reasonably satisfactory to Lessor of Lessee's compliance with all of Lessee's insurance requirements hereunder.

(b)    From and after the time Lessor gives physical possession of the Premises to Lessee, but subject to the other provisions of this lease and provided that Lessee is not in default hereunder, Lessee shall be entitled during the term hereof to have peaceful possession of the Premises and to quietly have and enjoy the Premises without any disturbance from Lessor or any other person claiming through Lessor. Subject to the provisions of Sections 19(b) and 21(a) hereof and the other provisions of this lease, Lessee shall be fully liable for payment and performance of Lessee's covenants hereunder from and after the date of full execution and delivery of this lease.

22.    Term of Lease.

(a)    Subject to Section 21(a) hereof, the term of this lease runs for five (5) years, from June 1, 2006 through May 31, 2011 (unless earlier terminated as herein provided). Except as expressly provided herein, (i) under no circumstances does the term of this lease run beyond May 31, 2011, and (ii) no representations have been made that Lessee's tenancy at the Premises will be extended beyond that date.

(b)    (i) Provided this lease is in full force and effect and Lessee is not in default hereunder either as of the date the First Renewal Option is exercised or upon expiration of the initial term of this lease on May 31, 2011, Lessee shall have the option (the "First Renewal Option") to extend the term hereof for a renewal term of five (5) years (the "First Renewal Term") by giving Lessor written notice (the "Renewal Notice" for the First Renewal Option) of Lessee's election to do so not less than six (6) months, nor more than nine (9) months, prior to expiration of the initial term hereof.

(ii) Provided this lease is in full force and effect and Lessee is not in default hereunder either as of the date the Second Renewal Option is exercised or upon expiration of the First Renewal Term, if any, on May 31, 2016, Lessee shall have the option (the "Second Renewal Option") (each of the First Renewal Option and the Second Renewal Option being a "Renewal Option") to extend the term hereof for an additional renewal term of five (5) years (the "Second Renewal Term") (each of the First Renewal Term and the Second Renewal Term being a "Renewal Term") by giving Lessor written notice (the "Renewal Notice" for the Second Renewal Option) of Lessee's election to do so not less than six (6) months, nor more than nine (9) months, prior to expiration of the First Renewal Term, if any.

(c)    (i) The Base Rent payable by Lessee to Lessor pursuant to Section 1 hereof for each Lease Year of a Renewal Term shall be payable in equal monthly installments, rounded to the nearest dollar.  The Base Rent for the first Lease Year of each Renewal Term (the "Renewal Year Base Rent") shall be equal to the greater of (A) three percent (3%) more than the Base Rent for the immediately preceding Lease Year (the "Minimum Renewal Year Base Rent"), and (B) the market Base Rent for the Premises at the commencement of the Renewal Term, as determined in accordance with the provisions of this Section 22(c) below (the "Market Renewal Year Base Rent").  The Base Rent for each of the second through fifth Lease Years of a Renewal Term shall be three percent (3%) greater than the Base Rent for the immediately preceding Lease Year.

(ii) If Lessee timely and properly exercises the First Renewal Option and, if applicable, the Second Renewal Option, then, not less than five (5) months prior to expiration of the initial term hereof and, if applicable, the First Renewal Term, Lessor shall send to Lessee a return notice indicating either (A) Lessor's statement that the Market Renewal Year Base Rent is not greater than the Minimum Renewal Year Base Rent, in which case the Minimum Renewal Year Base Rent will be the Renewal Year Base Rent, or (B) Lessor's statement of the amount of the Market Sixth Year Base Rent, if higher than the Minimum Renewal Year Base Rent.  In the latter case, if Lessee objects to Lessor's said statement of the Market Renewal Year Base Rent as set forth in said return notice from Lessor, Lessee shall give Lessor a further notice objecting to Lessor's said statement of the Market Renewal Year Base Rent within fourteen (14) days after Lessor has given Lessee said return notice, failing which the Renewal Year Base Rent shall be the amount of the Market Renewal Year Base Rent as set forth in Lessor's said return notice.

(iii) If Lessee, in such a timely further notice to Lessor, does so object to Lessor's said statement of the amount of the Market Renewal Year Base Rent, and if Lessor and Lessee are unable to agree upon the Market Renewal Year Base Rent within three (3) months prior to expiration of the then current term hereof, the Market Renewal Year Base Rent shall be determined by arbitration, which shall be promptly conducted before three arbitrators (unless the parties agree to one arbitrator) designated by the American Arbitration Association in accordance with the rules of such Association.  The arbitrator(s) designated and acting under this Section 22(c) shall make their determination in strict conformity with such rules and the provisions of this lease, and shall have no power to depart from or change any of the provisions of such rules or of this lease.  The parties shall bear equally the expense of arbitration proceedings conducted under this Section 22(c), but in any event each party shall be solely responsible for the costs of its own attorneys and related costs for its own benefit.  All such proceedings shall be conducted in the county in which the Premises are located.  Except as expressly provided in this

Section 22(c), nothing contained herein calls for the arbitration of any dispute between the parties. Irrespective of the arbitrator's (or arbitrators') determination of the Market Renewal Year Base Rent, the Renewal Year Base Rent may not, in any event, be less than the Minimum Renewal Year Base Rent.

(iv)  If for any reason a Renewal Term commences before the Renewal Year Base Rent for such Renewal Term is determined, then from the date of commencement of such Renewal Term until such determination is made, Lessee shall pay the Minimum Renewal Term Base Rent for the first Lease Year of such Renewal Term, and, if applicable, the Base Rent shall increase each Lease Year thereafter by three percent (3%) per Lease Year over the Base Rent for the immediately preceding Lease Year.  If the Base Rent for such Renewal Term is determined to be greater than the Base Rent so paid, Lessee shall, not less than ten (10) days following the issuance of such determination, pay to Lessor (A) the difference between the Base Rent so paid and the Base Rent which should have been paid on the basis of such determination, and (B) interest thereon at the rate of seven and one-half percent (7-1/2%) per annum from the dates such larger payments should have been made on the basis of such determination until the date such difference is actually paid, which interest shall be additional rental hereunder.  Lessee shall pay the Base Rent for the remainder of such Renewal Term on the basis of such determination, subject to the yearly Base Rent increases required under Section 22(c)(i) hereof.

(d)  Notwithstanding anything to the contrary in this lease, Lessor shall have the right to terminate this lease (as it from time to time may be modified and/or extended hereunder or otherwise by agreement of the parties), effective as of any date from and after May 31, 2011, and without any compensation to Lessee, if Lessor sells the Building with or without the land under it, or if Lessor proposes or is required, for any reason, (i) to rehabilitate or demolish the entire Building or any substantial portion of it, (ii) to sell the Building, with or without the land under it, (iii) to make a long term ground lease for all or substantially all of the land underlying the Building, or (iv) to convey Lessor's interest in such a long term ground lease, in the event Lessor first makes such a long term ground lease without terminating this lease (as it may be modified and/or extended) under the preceding item (iii).  Such termination shall become effective and conclusive by Lessor giving written notice thereof to Lessee not less than six (6) months prior to the effective termination date fixed in such notice.  The right reserved to Lessor in this Section 22(d) shall inure to the benefit of Lessor's purchasers, successors, assignees, principals, lessees, transferees, and ground lessees, as the case may be, and is in addition to all other rights of Lessor.

(e)  Notwithstanding anything to the contrary in this lease, but provided this lease is in full force and effect and Lessee is not in default hereunder either as of the date Lessee gives Lessee's Termination Notice to Lessor or as of the effective date of the termination of this lease fixed therein, in the event applicable federal, state, and/or local law at any point prohibits or further restricts, in any material respect, Lessee's use of the Premises as a retail store utilized primarily for the sale of tobacco products and accessories and in which the sale of other products is merely incidental and where no one under 18 years old is permitted, Lessee shall have the right to terminate this lease for such reason, without compensation to Lessor, effective as of any date after the end of the second Lease Year of either the First Renewal Term or the Second Renewal Term, if any, by (i) giving Lessor written notice ("Lessee's Termination Notice") of such termination not less than ninety (90) days prior to the effective termination date fixed in such notice, which notice shall state the specific reason(s) for such termination, and (ii) submitting to Lessor therewith a lease termination fee in the amount of one-third (1/3) of the total Base Rent that would otherwise be payable by Lessee from the effective date of such termination through the theretofore scheduled last date of the term of this lease, as extended.

(f)  Except for the provisions of this Section 22, and subject to any amendments or modifications of this lease, the terms, provisions, covenants, and conditions of this lease for any Renewal Term shall be the same as are contained in this lease immediately prior

to commencement of such Renewal Term.  In the event of Lessee's exercise of both Renewal Options as aforesaid, under no circumstances shall the term of this lease run beyond May 31, 2021.  No representations have been made that Lessee's tenancy at the Premises will be extended beyond that date.

23.    Condition of Premises and Building Systems.  Lessee shall take possession of the Premises and the mechanical equipment and Building systems serving the Premises strictly on an "as is" basis.  Lessor makes no warranties or representations that any of the mechanical equipment or Building systems serving the Premises work or will work or be sufficient to handle any expected requirements of Lessee.  Lessor shall not be required to make any improvements to the Premises or the mechanical equipment and Building systems serving the Premises, and Lessor shall have no responsibility for same.  To the best of Lessor's knowledge, there are no outstanding building code violation notices in respect of the Building as of the date hereof.

24.    Alterations, Improvements, Remodeling, Repairs, Etc.

(a)    Lessee shall be required to do all work and incur all costs, and under no circumstances shall Lessor be required to do any such work or incur any such costs, as may be needed to prepare the Premises, the storefront for the Premises, and the mechanical equipment and Building systems serving the Premises for Lessee to occupy the Premises and open for business in a first-class store in the Premises for the purpose(s) for which the Premises may be used hereunder, in compliance with all laws and regulations applicable to Lessee and its use of the Premises, and in conformity with plans, drawings, and specifications for such work reasonably approved by Lessor and with the other requirements for such work set forth in this lease.  In connection therewith, (i) Lessee represents and warrants that Lessee has budgeted the sum of $450,000.00 to $550,000.00 for the cost of building out the Premises and has such sum available to it for such purpose, and (ii) Lessee shall install a new HVAC system for the Premises, and/or shall make appropriate modifications to the existing HVAC system for the Premises, that will prevent smoke and odors from infiltrating from the Premises to areas outside the Premises.

(b)    All remodeling, alterations, additions, improvements, repairs, and replacements made by Lessee in respect of the Premises shall be at Lessee's sole expense, shall be subject to Lessor's reasonable control, and shall conform to Lessee's plans, drawings, and specifications for such work which shall be subject to approval by Lessor, including with respect to the Building's structure, schemes, and designs.  In addition to obtaining the consent of Lessor required under Section 10 hereof, prior to commencing any alterations, additions, improvements, remodeling, non-routine repairs, and/or non-routine replacements at or for the Premises or on any other part of the Building at any time (other than Lessee's initial build-out of the Premises), Lessee shall, if requested by Lessor, furnish to Lessor evidence reasonably satisfactory to Lessor that Lessee has prepaid for, and/or has set aside sufficient funds to complete, the work so to be done at the Premises, free and clear of any liens or encumbrances whatsoever.  Lessee shall be responsible for obtaining, and for paying the cost of, any and all permits required for any such proposed work. Lessee shall fully and promptly pay for all work done, or claimed to have been done, by or for Lessee at or for the Premises.  Lessee shall cause its contractor(s) to cooperate with, and be responsive to, Lessor's designated representative(s) for purposes of enabling Lessor to determine whether Lessee has complied with the provisions of Section 10 hereof and this Section 24 and whether Lessee has performed such work in strict compliance with the plans, drawings, and specifications for such work which, in any event, must be approved by Lessor before such work commences.  Lessor shall not unreasonably withhold or delay its approval of such plans, drawings, and specifications.

(c)    All work, improvements, and fixtures, whether furnished by Lessor or Lessee, in respect of the Premises shall become part of the Premises and shall be the property of Lessor at the termination of this lease, whether by lapse of time or otherwise; provided, however, that, as to any trade fixtures furnished by Lessee which Lessee may desire to detach and remove from the Premises prior to said termination, and as to any and all such items and/or other items furnished by Lessee which Lessor requests that Lessee remove from the Premises, Lessee, at its sole cost, shall detach and remove said items from the Premises and

shall return those portions of the Premises and/or the fixtures to which any of said items were previously attached in good and safe condition. For purposes of Section 10 hereof and this Section 24(c), "trade fixtures" are those pieces of attached furniture, equipment, counters, cabinetry, and shelving which are used in the process of, and for the specific purpose of, conducting Lessee's business at the Premises. Except as expressly provided above in this Section 24(c), Lessee may not remove from the Premises, among other things, any heating, ventilation, air-conditioning, or hot water heating equipment, or any bathroom, plumbing, window, light, or security fixtures.

25.    Housekeeping, Etc.

    (a)    Lessee shall keep all garbage, refuse, and waste at or from the Premises in covered, airtight receptacles, and shall properly maintain said devices. If and so long as Lessor at any point provides one or more refuse removal containers and coordinates a refuse removal service for the tenants of the Building, Lessee shall properly utilize said container(s) and pay to Lessor Lessee's pro rata share of said service, as determined by Lessor, as additional rent hereunder. Until such time, if any, as Lessor at any time provides said container(s) and/or service, Lessee shall provide and pay for its own refuse removal container and for its own scavenger service, with removal at a minimum of six (6) times per week (but this is subject to change, to a greater or lesser frequency of pick-ups, at Lessor's request, if in Lessor's absolute judgment sanitation requirements so warrant), and said refuse removal container shall be placed in any exclusive or nonexclusive scavenger pick-up area as may be designated by Lessor from time to time.

    (b)    Lessee shall employ as needed, at its own expense, an exterminator to keep the Premises free and clear of all rats, mice, insects, pests, and vermin of any nature, so as to prevent contamination of the Premises, the other parts of the Property, and surrounding properties.

    (c) · There are available to and installed at or for the Premises valuable mechanical equipment and Building systems for heating, ventilation, air conditioning, water heating, plumbing, electric service, gas service, etc. Proper operation, and the prompt and competent maintenance, repair, and replacement, of all the mechanical equipment and Building systems on, in, or exclusively serving the Premises, whether furnished by Lessor or Lessee, are the sole responsibility of Lessee, and Lessee shall perform any and all such maintenance, repairs, and replacements at its sole cost and expense, and shall return to Lessor, at the termination of Lessee's tenancy at the Premises, all of said equipment and systems (as improved and maintained as herein provided), installed and in good order and satisfactory condition, less ordinary and reasonable wear and tear.

    (d)    Lessee shall maintain, repair, and replace, as required to keep in good condition, the storefront for the Premises, the walls, doors, doorframes, locks, ceilings, floors, bathroom, sink(s), windows, and window frames of the Premises, and all other portions of the Premises and appurtenances thereunto. Upon termination of this lease, Lessee shall return the Premises to Lessor in good condition, as improved and maintained as herein provided, subject only to ordinary and reasonable wear and tear.

Without in any way limiting the provisions of Sections 6, 13, and 25(e) hereof or any other provisions hereof, but notwithstanding the foregoing provisions of Section 25© hereof or this Section 25(d), Lessee shall not be responsible for maintaining, repairing, or replacing the electrical, plumbing, and HVAC equipment and systems in the Building that is neither on or in the Premises or exclusively serving the Premises, nor the foundation, floor joists, roof, and exterior walls of the Building; provided, however, that Lessee shall be so responsible for (i) the storefront and any exterior signage, awning, and/or banner for Lessee and/or the Premises, (ii) all flashings and any other roof, exterior wall, or structural work as may be needed in respect of any and all roof, exterior wall, floor and/or ceiling penetrations made by or for Lessee or otherwise for the benefit of the Premises and/or in respect of all rooftop equipment and/or any other equipment or systems exclusively serving Lessee or the Premises, and (iii) any maintenance, repair, or replacement in, on, or about the Building that is needed at any time due to (A) Lessee's build-out or

specific use of the Premises, or (B) the fault of Lessee, its servicemen, contractors, employees, customers, prospective customers, or anyone else through Lessee, or anyone protesting or demonstrating for or against smoking, tobacco, Lessee, Lessee's affiliates, and/or Lessee's use of the Premises.

(e)    Lessee agrees to install and maintain grease traps for the sinks, drains, and other plumbing in and for the Premises so as to catch and eliminate grease or hard waste, and prevent grease and hard waste from entering the drain or sewer lines in or for the Premises, branch lines, and/or the main line to the street.  Should Lessor or Lessee find any kind of debris from or attributable to Lessee in the drain lines in or for the Premises, branch lines, and/or the main line to the street, as the case may be, Lessee shall be fully liable therefor and shall pay the costs for rodding such drain lines.  Lessor may, but need not, arrange for such rodding to be done in a manner not through Lessee, and all costs incurred by Lessor in connection therewith shall be reimbursed to Lessor by Lessee and shall be considered additional rent hereunder.

(f)    Lessee, at its sole cost, shall furnish, install, and maintain in good operating condition, with proper placement at all times, and in compliance with all applicable code requirements for the Premises, an appropriate number of smoke detectors, fire extinguishers, and carbon monoxide detectors suitable for the Premises.

(g)    Lessor shall not permit any customers, prospective customers, and/or other persons, while outside and of and nearby the Premises, to smoke or drink alcoholic beverages (except passing sidewalk pedestrians in the ordinary course), to congregate, or to picket and/or protest for or against smoking, tobacco, Lessee, any affiliate of Lessee, and/or Lessee's use of the Premises.  Lessee shall, at its sole expense, use all reasonable legal means to prevent any such event or activity, whether before, upon, or as soon as practicable after the occurrence of any such event or activity.

(h)    Lessor shall be given routine access to the Premises during ordinary working hours for inspection purposes to ascertain that the requirements under Section 11 hereof and this Section 25 are being met.

26.    Insurance.

(a)    Lessee, at Lessee's expense, shall purchase and maintain insurance during the term hereof for the benefit of Lessor, General Auto Service Station, LLC (which is the sole beneficial owner of the property for which Lessor is acting as nominee/agent hereunder), Malet Realty, Ltd. (or any successor managing agent for the Property), any mortgagee(s) for the Property, and their respective agents, employees, nominees, successors, and assigns (as their respective interests may appear) (the "Insured Parties"), and for the benefit of Lessee, with terms and coverages, and in companies, that are satisfactory to Lessor. Lessee agrees to adjust the amounts and types of coverages set forth herein, as required by Lessor, if the customs or standards in the leasing community change during the term of this lease; but, initially, Lessee shall maintain at a minimum the following insurance coverages with the following limits:

(i) Commercial general liability insurance on an occurrence basis having (A) a minimum combined single limit of liability for each occurrence in the amount of not less than five million dollars ($5,000,000.00) for bodily injury, personal injury, death, and/or property damage (including, but not limited to, water damage), and (B) an annual aggregate limit of liability of not less than ten million dollars ($10,000,000.00) for same.  Said insurance coverage may be from a combination of Lessee's primary and excess umbrella coverages under one or more policies that shall cover Lessee's assumed contractual liabilities under this lease; and

(ii) Comprehensive automobile insurance covering all owned, nonowned, and hired automobiles of Lessee which (A) has a minimum combined single limit of liability for each accident of not less than five million dollars ($5,000,000.00) for bodily injury, death, and/or property damage, and (B) covers the loading and unloading of any automobile.  Said insurance coverage may be from a combination of Lessee's primary and excess umbrella coverages under one or more policies; and

(iii) Coverage against all losses from fire, vandalism, and malicious mischief and extended coverage), in an amount adequate to cover Lessee for business interruption and to cover both Lessor and Lessee (to the extent of their respective interests therein) for the full replacement cost value of the leasehold improvements, plate glass, and business personal property in and for the Premises (including, without limitation, inventory, machinery, equipment, movable partitions, furniture, trade fixtures, and wall and floor coverings) and in an amount that meets any coinsurance clause requirements of the policy or policies of insurance; and

(iv) Full and comprehensive liquor liability and dram shop insurance on an occurrence basis. Lessee's right hereunder to store, sell, dispense, use, serve, permit consumption of, or give away alcoholic liquor or beverages or other intoxicating liquor products in, on, or from the Premises, as expressly provided elsewhere herein, is conditioned upon Lessee first furnishing the insurance policy as herein provided, and is further subject to and conditioned upon the following conditions:

(A) Lessee covenants and agrees to, and does hereby, indemnify, defend, and save and keep harmless the Insured Parties, during the continuance of this lease, from and against any and all suits, demands, claims, damages, payments, fines, liens, penalties, judgments, costs, and expenses whatsoever which may result to any or all of the Insured Parties, or to the Premises, the Building, the Property, or any part thereof, under or by force of the provisions of any present or future statute, ordinance, regulation, or other law, rule, or governmental measure of the United States of America, the State of Illinois, Cook County, Illinois, or the City of Chicago, Illinois, or any agencies or instrumentalities thereof, concerning the manufacture, storage, sale, use, serving, distribution, permitting consumption, or giving away of alcoholic liquor or other intoxicating liquor products in, on, or from the Premises, or otherwise in connection with this lease.

(B) Lessee must procure and maintain throughout the term of Lessee's occupancy of the Premises one or more policies of insurance in form reasonably satisfactory to Lessor, with the broadest coverage reasonably obtainable, indemnifying, defending, and saving and keeping harmless the Insured Parties from and against any and all claims, suits, payments, demands, damages, judgments, fines, penalties, liens, costs, and expenses whatsoever for which claim ever shall be made against any or all of the Insured Parties, or against the Premises, the Building, the Property, or any part thereof, by any person(s) who shall have been injured in any way in consequence of the intoxication, habitual or otherwise, of any person(s) resulting directly or indirectly from the manufacture, storage, sale, distribution, serving, use, permitting consumption, or giving away of alcoholic liquor or other intoxicating liquor products in, on, or from the Premises, or otherwise in connection with this lease, and for which injury or injuries any or all of the Insured Parties may be liable, or may be claimed to be liable, under or by virtue of the Illinois Liquor Control Act of 1934, as amended, or of any other federal, state, or local statute, ordinance, regulation, or other law, rule, or governmental measure. The amount of coverage for such insurance, for which Lessee shall pay the full premium cost, shall be a combined single limit of liability for each occurrence in the maximum amount available at a commercially reasonable cost, but in no event less than two million dollars ($2,000,000.00), for bodily injury, personal injury, death, and/or property damage (including, but not limited to, water damage). Such combined single limit sum shall be (1) increased as additional coverage is available, to the maximum extent available at a commercially reasonable cost, including additional coverage through an excess/umbrella liability policy, and (2) exclusive of all interest accruing on any judgment, which interest shall be paid by the carrier(s).

The existence of such policy or policies shall not limit or affect Lessee's undertakings set forth in Section 26(a)(iv)(A) above.  The coverage therein shall be on an occurrence basis, for occurrences arising during the term of this lease and of Lessee's occupancy of the Premises, and shall remain in effect for any such claims made thereafter.

(C)   The manufacture, storage, sale, distribution, use, serving, or giving away of any alcoholic liquor or other intoxicating liquor products in, on, or from the Premises, or otherwise in connection with this lease, at any time or times during the term of Lessee's occupancy of the Premises when said policy (or policies) is not (or are not) in full force and effect, shall constitute a breach of this lease entitling Lessor forthwith, to the extent permitted by law, to terminate such term or this lease by entry or by notice, as Lessor may elect, and to recover from Lessee any damages, including, without limitation, all sums of money for which any or all of the Insured Parties may become liable to pay to any person(s) as a result of any violation of the Illinois Liquor Control Act of 1934, as amended, or any other statute, ordinance, regulation, or other law, rule, or governmental measure concerning same, together with the costs and expenses of any or all of the Insured Parties.

(D)   The terms "manufacture," "sale," "sell," and "alcoholic liquor," as used in this Section 26(a)(iv) and/or in Section 11(b) hereof, have the same meanings as are defined in Article 1 of the Illinois Liquor Control Act of 1934, as amended.

(b)   The Insured Parties shall be additional insureds under each policy referred to in Sections 26(a)(i) and (iv) hereof (including, without limitation, any excess and/or umbrella liability coverage policies applicable to each such policy), to the full extent of the policy limits thereunder, but such additional insured coverage may be limited to coverage with respect to claims arising out of Lessee's use and/or occupancy of the Premises and/or any other part of the Building and surrounding areas.  The policy referred to in Section 26(a)(iv) hereof also shall specifically list General Auto Service Station, LLC and/or its respective successors and assigns as the owner of the Premises/Building.  No policy referred to in Section 26(a) hereof shall be subject to any deductible amount unless such a deductible is customary for Lessee's use of the Premises, but in no event shall any policy referred to in Section 26(a) hereof provide for any deductible amount over $5,000.00 per occurrence.  Each policy referred to in Section 26(a) hereof (i) shall provide for the insurer to pay for unlimited reasonable defense costs separate from any limits of liability as shall be incurred prior to any such time as the applicable limit(s) of liability shall be exhausted by the insurer's payment of any judgment(s) or settlement(s), and (ii) shall provide by its terms that such insurance may not be canceled (or amended in a manner adverse to Lessor's interests) without at least thirty (30) days prior written notice to Lessor.  Lessee shall deliver to Lessor copies of all the insurance policies that Lessee is required to maintain hereunder, including all renewals and replacements thereof (or, if acceptable to Lessor, original certificates of insurance and copies of declarations pages and applicable endorsements for all such policies), prior to taking possession of the Premises and not less than ten (10) days prior to the expiration date or any other date of cancellation of such policies.

(c)   Each policy referred to in Section 26(a) hereof (i) shall provide coverage thereunder on a primary and non-contributory basis, (ii) shall provide that such insurance coverage thereunder shall not be invalidated should the insured thereunder waive in writing, prior to an occurrence giving rise to an insured claim thereunder, any or all right of recovery the insured would otherwise have had against any of the Insured Parties in connection with such occurrence, and (iii) shall contain an express waiver of subrogation whereby the insurer waives any right of recovery it would otherwise have against any of the Insured Parties in connection with such occurrence.  Lessee hereby waives any and all claims for recovery from the Insured Parties for any loss or damage to any insured property of Lessee at the Premises and with

respect to any liability Lessee (or another insured) may have that is covered under the policies referred to in Section 26(a) hereof.

     (d)   All policies of insurance to be purchased and maintained by Lessee hereunder with respect to leasehold improvements and any property of Lessor shall provide by their respective terms that any losses or claims thereunder shall be adjusted solely by, and the proceeds thereof shall be payable solely to, Lessor (or Lessor's designee), to the extent of Lessor's (or Lessor's designee's) insurable interest therein, with no interest therein being included as to Lessee.

     (e)   Lessee agrees to, and does hereby, indemnify, defend, keep harmless, and insure, the Insured Parties, jointly and severally, to the extent permitted by law, against any and all claims, suits, fines, judgments, costs, reasonable attorneys' fees, liens, and other matters arising out of or in connection with this lease and/or the use or occupancy of the Premises or any other part of the Property and surrounding areas by Lessee or anyone through Lessee (including, without limitation, any and all claims, suits, fines, judgments, costs, reasonable attorneys' fees, liens, and other matters at any time arising out of or in connection with any smoking, tobacco sales, and/or alcoholic beverage sales or consumption at the Premises during the term hereof and/or any picketing or protests pertaining thereto).

27.   Failure to Comply with Requirements; Additional Rent.  In the event of any breach by Lessee of the provisions hereof with respect to alterations, additions, improvements, repairs, replacements, services, utilities, maintenance, housekeeping, compliance with laws, and/or insurance requirements, Lessor, as an additional remedy, may, but need not, make such payments and take such other actions as may be necessary to remedy same.  In any of these events, Lessee shall reimburse Lessor's costs in connection therewith promptly (but in no event later than ten (10) days after being billed therefor) as additional rent hereunder.

28.   Non-Rental Defaults.  In the event of a default hereunder by Lessee (other than a default that involves a hazardous condition or a failure by Lessee to pay any Base Rent, Real Estate Tax Rent, Insurance Rent, or other additional rents or other amounts due to Lessor hereunder), which default by its nature cannot reasonably be cured within the twenty (20) day period provided for in Section 15(b) hereof, then, provided that Lessee promptly commences to cure the condition complained of and promptly notifies Lessor thereof in writing during said twenty (20) day period, said twenty (20) day period shall be extended one day for each day that Lessee thereafter continues to diligently pursue such cure to completion.

29.   Potential Litigation.  Lessee, at its own cost and expense, and within seventy-two (72) hours of receipt of notice or knowledge of same, whichever occurs first, shall notify Lessor of any claims, notices, incidents, altercations, damages, and injuries to or in respect of the Property, the Premises, Lessee, or Lessor, which might foreseeably result in litigation or administrative action against the Property, the Building, the Premises, Lessee (if Lessee's ability to comply with its obligations under this lease may be affected thereby), or Lessor, or any combination of them.  In Lessee's notification to Lessor, Lessee shall furnish Lessor with copies of any and all documents that may have been presented to, are in the possession of, or were served upon, Lessee in connection therewith.

30.   Notice.  Any notice which either party hereto may desire or may be required to give to the other party shall be in writing; and (as alternative methods of providing notice by Lessor to Lessee in addition to the methods set forth in Section 16 hereof) the delivery of any such notice, or the mailing thereof by United States certified mail, return receipt requested, to the following persons and addresses, or to such other person(s) or address(es) as either party hereto may designate by notice in writing to the other party, shall constitute service of notice hereunder:

If to Lessee, to:

R. J. Reynolds Smoke Shop, Inc.
401 North Main Street, 6th Floor
Winston-Salem, NC  27104
ATTN:  E. Scott Rhodes, Jr.

If to Lessor, to:

F.A.Y. Properties, Inc.
P.O. Box 6615
Chicago, IL  60680
ATTN:  Nathaniel I. Grey

   With a copy to:

   Grey, Grey & Baltz, P.C.
   11 South LaSalle Street, Suite 1320
   Chicago, IL  60603
   ATTN:  Jordan A. Grey

Notice shall be deemed to be given five (5) business days after such
mailing, or, if sent by local messenger service, Federal Express, or
similar overnight delivery service (including, without limitation, U.S.
Express Mail), the date of delivery, if delivered (or if not delivered,
the date of original attempted delivery, if attempted on a business day
during business hours).

31.    Brokers.  Lessee represents and warrants to Lessor that (i) the only
       broker Lessee has retained in any capacity in connection with this
       lease is Janika Brenner of Baum Realty Group, Inc. ("Lessee's Broker"),
       (ii) Lessee is not aware of any claims, or any basis for any claims, by
       any other person, business, or entity for a commission as a procuring
       cause or otherwise in connection with this lease or Lessee's becoming a
       tenant at the Premises, except for CB Richard Ellis, the broker
       retained by Lessor in connection herewith ("Lessor's Broker"), and
       (iii) Lessee's Broker has agreed to share equally with Lessor's Broker
       the $24,589.00 total commission that Lessor anticipates paying to
       and/or at the direction of Lessor's Broker in connection with this
       lease, in installments pursuant to a written agreement between Lessor
       and Lessor's Broker.  Lessee acknowledges that (A) for each installment
       of such commission, Lessor would not be willing to pay directly to
       Lessee's Broker its share thereof without Lessor first receiving
       written direction to do so from Lessor's Broker, appropriate tax
       identification information for Lessee's Broker, and a separate accurate
       dated invoice from each broker for each such installment when it comes
       due, and (B) Lessor will not in any event be paying a broker's
       commission in connection with this lease in the event Lessee terminates
       this lease pursuant to the provisions of Section 22(e) hereof.  Lessee
       further acknowledges that Lessee's Broker has confirmed its
       understanding and acceptance of the matters set forth in the provisions
       of this Section 31 above.

32.    Miscellaneous.

       '(a)    Lessee shall maintain its Authority to Transact Business in
       the State of Illinois in good standing throughout the term hereof, and
       shall cause R. J. Reynolds Tobacco Company, a North Carolina
       corporation and the guarantor of Lessee's obligations hereunder (the
       "Guarantor"), to maintain its Authority to Transact Business in
       Illinois in good standing throughout the term hereof.  Lessee
       represents, and E. Scott Rhodes, Jr., in his capacity as Vice President
       of Lessee, hereby certifies, that (i) Lessee is authorized to use the
       assumed corporate name of "Marshall McGearty Tobacco Artisans" in the
       operation of Lessee's business at the Premises pursuant to a valid
       license from the Guarantor, which maintains such assumed corporate name
       registration on file with the Secretary of State of Illinois, and (ii)
       Lessee reasonably anticipates that Lessee will continue to have the
       right to so use such assumed corporate name throughout the term hereof.
       At all times during the term hereof while Lessee is operating its
       business at the Premises under the assumed corporate name of Marshall
       McGearty Tobacco Artisans, Lessee shall either maintain, or cause the
       Guarantor to maintain, an active registration for such assumed
       corporate name with the Secretary of State of Illinois; provided,
       however, that if and for so long as the Guarantor, instead of Lessee,
       continues to so maintain said assumed corporate name registration,

Lessee shall have licensed from the Guarantor the right to use such assumed corporate name and all necessary related trademarks and trade names in connection with the operation of Lessee's business at the Premises. Prior to any and each such time as Lessee may begin to operate its business at the Premises, or any portion thereof, under a name other than "R. J. Reynolds Smoke Shop," "R. J. Reynolds Smoke Shop, Inc.," or "Marshall McGearty Tobacco Artisans," and within thirty (30) days after any and each such time as Lessee changes its true corporate name, Lessee shall submit to Lessor a copy or copies of one or more documents from the Secretary of State of Illinois verifying that Lessee is authorized to conduct business in Illinois under such different name as an assumed corporate name or, as the case may be, a new true corporate name.

(b)   This lease represents the entire agreement between the parties hereto with respect to the subject matter hereof.

(c)   This lease may not be amended or modified, nor may any term or provision hereof be waived or discharged, except by a written instrument signed by the party against whom enforcement thereof may be sought.

IN WITNESS WHEREOF, this Store Lease, including the form part hereof, this Rider, and the exhibits hereto, has been executed on the date(s) set forth below, as of the date first above written.

LESSOR:                                  LESSEE:

F.A.Y. PROPERTIES, INC.                  R. J. REYNOLDS SMOKE SHOP, INC.

By_____              By_____
   Nathaniel I. Grey                        E. Scott Rhodes, Jr.
   President                                Vice President

Date_____6/1/06_____,              Date__6.22.06_____
   said date being the date of
   full execution and delivery
   hereof

G:\GASS\RealEst\ChgoProps\Belmt Garg\Leases\RJ Reynolds Smoke Shop\RJ Reynolds Lse Rider draft 3 for execution.doc

GUARANTY

In consideration of Lessor's entering into the above lease, and to induce Lessor to enter into such lease, the undersigned guarantor (the "Guarantor") hereby (i) guarantees the payment and collection of all rents and other sums required to be paid by Lessee under the above lease, (ii) guarantees the performance by Lessee of all the terms, conditions, covenants, and agreements applicable to Lessee thereunder, and (iii) promises to pay all of Lessor's reasonable expenses, including, without limitation, reasonable attorneys' fees and costs, as may be incurred by Lessor in enforcing the obligations of Lessee thereunder or as may be incurred by Lessor in enforcing this Guaranty.

The Guarantor hereby waives all rights to notice of any Lessee defaults under the above lease. Whether made with or without notice to the Guarantor, neither

   (i) Lessor's consent to any changes of control of the ownership of any Lessee under the above lease which is a corporation, limited liability company, general or limited partnership, or other entity, or of any parent of such Lessee, or to any subsequent changes of control of the ownership of any such Lessee or parent of such Lessee, nor

  (ii) Lessor's consent to any subleases or assignments of the above lease by any such Lessee or such Lessee's assigns, nor

 (iii) Lessor's consent to any changes or different use of the Premises, nor

  (iv) Lessor's forbearance, delays, or extensions of time in respect of the above lease and/or this Guaranty (or any other guaranty) for any reason, nor

   (v) any other act of Lessor or anyone on behalf of Lessor,

shall, in the absence of an express written waiver and/or release to such effect signed by Lessor, in any manner relieve or release the Guarantor of or from its obligations and liability as guarantor as aforesaid.

The Guarantor hereby represents that (i) it is the sole shareholder of Lessee, and as such has a stake in the welfare, success, and viability of Lessee, (ii) the Guarantor's sole shareholder is R.J. Reynolds Tobacco Holdings, Inc., a Delaware corporation that is a wholly-owned subsidiary of Reynolds American Inc., a publicly-held North Carolina corporation for which filings with the Securities Exchange Commission and consolidated financial statements are publicly available, and (iii) the Guarantor is a North Carolina corporation and is the principal operating subsidiary (albeit an indirect subsidiary) of said Reynolds American Inc. The Guarantor hereby acknowledges that Lessor has relied on information contained in such publicly available filings and financial statements in accepting this Guaranty and entering into the above lease without a security deposit.

This Guaranty shall be binding upon the respective successors and assigns of the Guarantor.

Except as the context may otherwise require, all capitalized terms used in this Guaranty have the same meanings given them in the above lease.

IN WITNESS WHEREOF, this Guaranty, dated as of April 6, 2006, has been executed by the Guarantor contemporaneously with execution of the above lease.

GUARANTOR:

R. J. REYNOLDS TOBACCO COMPANY

By _J. Brian O'Brien_____

Printed Name _John Brian O'Brien_____

Title _Sr. V.P. Consumer Marketing_____

Date _6 | 22 | 06_____

EXHIBIT A

The Premises

(The Premises are outlined in red below.)



EXHIBIT B

Supporting Statement for 2005 Base Year Insurance Premiums

**RAVID &**
**BERNSTEIN LLP**

*Certified Public Accountants*

♦ John V. Basso, CPA
♦ William H. Brock, CPA
♦ Mark T. Jason, CPA
♦ Phillip C. Ravid, CPA

April 26, 2006

Mr. Jordan Grey
Grey, Grey & Baltz, P.C.
11 South LaSalle Street, Suite 1320
Chicago, Il 60603-1209

**Re: 2005 Building Insurance Premiums for**
**3155-63 North Broadway, Chicago, IL 60657**

Dear Mr. Grey:

The total cost of the Building Insurance premiums incurred for the calendar year 2005 for 3155-63 North Broadway Avenue, Chicago, IL is $5,668. Of this cost, $4,043 is for property insurance covering the Building on the property (including loss of rents or business income coverage), and $1,624 is for the public/commercial general liability insurance (including excess liability coverage) for the Building protecting the landlord's interests.

Sincerely yours,

William H. Brock, CPA

S:\Brock\Clients\Bud_Gass\GASS\GASS2005\05 Ins Alert 3155_63NBroadway.doc

230 West Monroe Street   ♦   Suite 330   ♦   Chicago, IL 60606   ♦   Tel. 312/782 4710   ♦   Fax 312/782 4711